JAMES R. HILES & another[1] *vs.* EPISCOPAL DIOCESE OF
MASSACHUSETTS & others.[2]

No. 99-P-249.

Middlesex. November 9, 2000. - March 28, 2001.

Present: LAURENCE, SMITH, & GILLERMAN, JJ.

Further appellate review granted. 434 Mass. 1106 (2001).

*Libel and Slander. Jurisdiction,* Ecclesiastical controversy. *Practice, Civil,*
Dismissal.

Discussion of the exclusive jurisdiction of hierarchical religious organizations
in matters concerning theological controversy, church discipline,
ecclesiastical government or the conformity of church members to required
moral standards, which is based in the First and Fourteenth Amendments
to the United States Constitution. [226-228]
A claim of defamation brought by an Episcopal priest against a woman, and
claims of civil conspiracy brought against the Bishop and the Suffragan
Bishop of the Episcopal Diocese of Massachusetts and the Episcopal
Diocese, arising from allegations of sexual misconduct, constituted, in the
circumstances, a secular dispute and not an ecclesiastical matter under the
exclusive jurisdiction of the Episcopal Church; a judge of the Superior
Court erred in dismissing the claims. [228-231, 232]
In a civil action brought by an Episcopal priest against the Bishop of the
Episcopal Diocese and the Standing Committee of the Diocese, a Superior
Court judge correctly dismissed the plaintiff's civil rights claims for al-
leged violation of his First Amendment rights of assembly, worship and
free speech arising from defendants' bringing ecclesiastical charges against
him in accordance with the Canons of the Episcopal Church, as the claims
presented a matter of church discipline, a religious controversy under the
exclusive jurisdiction of the Episcopal Church. [231-232]
A Superior Court judge correctly dismissed a conclusory allegation of civil
conspiracy that failed to state a claim [232]; similarly a claim of slander
[234].

[1]Lauretta Hiles, his wife.

[2]Linda M. Hastie; M. Thomas Shaw III, individually and as Bishop of the
Episcopal Diocese of Massachusetts; Barbara C. Harris, individually and as
Suffragan Bishop of the Episcopal Diocese of Massachusetts; the Standing
Committee of the Episcopal Diocese of Massachusetts and its members, both
individually and as members thereof, namely, F. Davis Dassori, Jr., David A.
Killian, Robert Bacon, Diane M. Edson, Byron Rushing, Cathy H. George,
and Marjorie A. Burke. Members of the Standing Committee are collectively
referred to as the Standing Committee.

Civil claims alleging dissemination of defamatory information should not have been dismissed where genuine issues of material fact remained. [233-234]

A claim for intentional infliction of emotional distress based on alleged extreme and outrageous conduct directed at the plaintiff's spouse was properly dismissed. [234]

CIVIL ACTION commenced in the Superior Court Department on May 13, 1996.

Motions to dismiss were heard by *Wendie I. Gershengorn*, J.

*Stephen C. Hoctor* for the plaintiffs.

*William F. Looney, Jr.* for the Episcopal Diocese of Massachusetts & others.

*Clyde D. Bergstresser* for Linda M. Hastie.

GILLERMAN, J. The plaintiff James R. Hiles (Hiles) is rector of St. Paul's Episcopal Church (St. Paul's), an Episcopal parish located in Brockton, and vicar of the Church of Our Savior, an Episcopal mission located in Milton. The defendants include the Bishop and Suffragan Bishop of the Episcopal Diocese of Massachusetts, the Massachusetts Episcopal Diocese (Diocese), members of the Standing Committee of the Diocese (collectively, the Episcopal defendants), and Linda M. Hastie (Hastie). See note 2, *supra*.

The complaint sets out sixteen counts. The motion judge's order dismissed two counts on Hastie's motion to dismiss, allowed motions for summary judgment on twelve counts, and remanded two counts for further proceedings. Final judgment was entered under Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974), on the two counts in which Hastie's motion to dismiss was allowed, and on twelve counts in which summary judgment[3] for the Episcopal defendants was allowed. Two counts were remanded to the District Court for further proceedings. The plaintiffs have appealed all adverse rulings except count IV (interference with contractual relationship). We reverse in part and affirm in part.

*The complaint and the record before this court.* We summarize the allegations in the complaint, as amplified by the af-

---

[3] The Episcopal defendants' motion to dismiss was treated as a motion for summary judgment. See note 4, *infra*.

fidavits and exhibits filed by the Episcopal defendants in support of their motion to dismiss, and by the plaintiffs in their opposition to the defendants' motions.[4]

In 1990, a parishioner bequeathed approximately $2 million to the Church of Our Saviour. The Episcopal Diocese and Hiles disagreed as to which entity was entitled to the bequest — the church or the Diocese. On or about December 23, 1995, as a result of this disagreement, the Right Reverend M. Thomas Shaw, III, Bishop of the Diocese of Massachusetts (Shaw), summoned Hiles to his office, accused him of being stubborn, a bully, and a liar, and struck him with a "missile" (i.e., a pen).[5] Shaw threatened to remove Hiles from his position as vicar of the Church of Our Saviour. Hiles, apparently, was unyielding.[6]

The complaint continues with an account of additional events. Hiles, a married man, met the defendant Hastie (then unmarried) in the late 1960's. Hastie had accepted Hiles's invitation to perform certain work for the Church of Our Saviour. Her

---

[4]The documents were not excluded by the judge, and no motions were made to strike the documents. Hastie's motion to dismiss also recited matters outside the pleadings. To the extent that the motion judge considered documents other than the complaint, she was free to treat the defendants' motions to dismiss as motions for summary judgment. See *Bell* v. *Zoning Bd. of Appeals of Gloucester*, 429 Mass. 551, 555 (1999).

In either event, we take the allegations of Hiles — the party opposing both motions — as true for purposes of this decision only, drawing all permissible inferences in his favor. See, as to motions for summary judgment, *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 17 (1983); *Douillard* v. *LMR, Inc.*, 433 Mass. 162 (2001); and as to motions to dismiss, *Harvard Law Sch. Coalition for Civil Rights* v. *President & Fellows of Harvard College*, 413 Mass. 66, 68 (1992). Further, under a motion to dismiss, the motion "should not be allowed unless it appears certain that the complaining party is not entitled to relief under any state of facts which could be proved in support of the claim." *Ibid.*, quoting from *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 191 (1982). Under Mass.R.Civ.P. 56, 365 Mass. 824 (1974), summary judgment may be rendered if the record shows that "there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989).

[5]It is not clear whether this meeting occurred on December 21 or December 23, 1995. Hiles alleges in count XIV that Bishop Shaw threw a pen at him on December 21, 1995.

[6]An action to determine who should receive the bequest was pending in the Probate Court at the time the complaint in this case was filed.

subsequent romantic advances to Hiles, it is alleged, were rejected.

Shortly prior to March 27, 1996, Hastie wrote a letter to the defendant Shaw accusing Hiles of having had an adulterous relationship with her that continued from the Spring of 1970 until the Fall of 1975, and stating that on December 4, 1975, she terminated a pregnancy, aborting the fetus fathered by Hiles. The complaint alleges that Hastie's letter "was the culmination of several prior contacts between her and employees of the Diocese in which these employees and agents urged her to write the letter. Defendants Shaw and the Diocese knew or reasonably should have known that the allegations contained in the letter were . . . false. Their entire purpose was to provide a reason for . . . Shaw to remove Hiles from his pastoral duties in the hopes that if he was removed, the Church of Our Savior would turn . . . over [the bequest] to the Diocese."

On March 27, 1996, the complaint continues, Shaw summoned Hiles to his office, read him the letter from Hastie, and presented Hiles with a document dated March 27, 1996, constituting notice that Shaw had issued a "Temporary Inhibition" against Hiles that recited the accusations of Hiles's sexual misconduct and instructed Hiles, inter alia, not to perform any functions as a priest, and to remove all his personal effects from St. Paul's and the Church of Our Saviour. Further, he was thereafter forbidden to enter the property of either church and was required to "turn over" all funds of the two churches, together with an accounting. Finally, Hiles was not to discuss the matter with anyone other than his wife, legal counsel, and spiritual counsel.

On March 28, 1996, Shaw and the defendant Suffragan Bishop Barbara C. Harris (Harris) gave written notice to all the clergy in the Diocese — alleged to be about 500 persons — that Hiles "has been inhibited from exercising his priestly functions in the Diocese of Massachusetts due to formal charges of sexual misconduct." The notice to the clergy referred to the fact that "[t]he press has been informed."

A copy of the press release does not appear in the record. However, copies of the story appearing in the Boston Globe on March 30, 1996, in the Brockton Enterprise on the same date, and in the Milton Record-Transcript on April 5, 1996, were at-

tached to the motion to dismiss filed by the Episcopal defendants and are included in the record. All three newspaper articles recite the charge against Hiles for "sexual misconduct," and his resulting suspension from his "priestly duties" or "priestly function."[7] The complaint alleges that "[t]his is the first time in the history of this diocese . . . that an [I]nhibition has not been kept entirely confidential pending a complete investigation and resolution of the complaint."

On April 24, 1996, the Standing Committee of the Diocese affirmed the Temporary Inhibition issued by Shaw, and on May 6, 1996, Hastie filed formal charges against Hiles with the Diocese.

On May 13, 1996, Hiles filed suit alleging counts of libel and slander against Hastie (count I); conspiracy against Hastie (count II); conspiracy against Shaw (count III); interference with contractual relations against Shaw (count IV); Federal and State civil rights violations against Shaw (counts V & VI); Federal and State civil rights violations against the Standing Committee (counts VII & VIII); conspiracy against Harris (count IX); conspiracy against the Diocese (count X); negligence against Shaw (count XI); negligence against Harris (count XII); slander against Shaw (count XIII); and assault and battery against Shaw (count XIV). Mrs. Hiles brought counts of loss of consortium (count XV) and intentional infliction of emotional distress (count XVI) against all defendants. Each count in the complaint incorporates all the historical factual allegations summarized above.

In support of their opposition to the defendants' motions to dismiss, Hiles and his wife filed affidavits dated August 27, 1996; Hiles stated under oath that the "allegations levelled against me by Linda M. Hastie are entirely false."

The defendants defend principally on the ground that this action is barred by the First Amendment to the United States Constitution, which precludes the jurisdiction of civil courts in

---

[7]The caption to the story appearing in the Boston Globe was, "Church battles bishop"; the caption in the Brockton Enterprise was "Rector faces sex charges; vestry claims it's retaliatory"; the caption in the Milton Record-Transcript was "The Rev. James Hiles Inhibited in Exercising [*sic*] Priestly Functions."

ecclesiastical matters. To that end, pursuant to Mass.R.Civ.P. 12(b)(1), (2), and (6), 365 Mass. 755 (1974), the Episcopal defendants, on September 3, 1996, filed a motion to dismiss all the counts against them.

The supplementary appendix filed by the Episcopal defendants includes the documents filed in support of their motion. Among the documents is the Presentment which, following issuance of the Temporary Inhibition, had been issued by the Ecclesiastical Trial Court of the Diocese charging Hiles with "1. Immorality," "2. Conduct unbecoming a member of the clergy," "3. Violation of the Canons of the 1994 General Convention of the Protestant Episcopal Church" by violating the confidentiality requirements of the Canons (see note 8, *infra*) through the filing of an action (i.e., this action) in the Middlesex Superior Court concerning the ecclesiastical charges against him prior to the Standing Committee's issuance of a Presentment, and "4. Violation of the Canons of the 1994 General Convention of the Protestant Episcopal Church" by filing this action "for the purpose of delaying and hindering" the disciplinary proceedings pending in the trial court of the Diocese.[8]

Paragraphs one and two of the Presentment were adopted by a vote of two-thirds of the members of the Standing Committee on July 16, 1996, and paragraphs three and four were similarly adopted on August 6, 1996.

On October 11, 1996, after deposing the two plaintiffs, Hastie filed a motion to dismiss all counts against her, citing Mass.R. Civ.P. 12(b)(1), (2), and (6), and a motion for a protective order, see Mass.R.Civ.P. 26(c), as amended, 423 Mass. 1401 (1996), seeking to prevent discovery by the plaintiffs pending the resolution of Hastie's motion to dismiss. On October 22, 1996, the

---

[8] Also attached to the motion to dismiss is a copy of portions of the Canons as revised by the 1994 General Convention of the Protestant Episcopal Church in the United States. Canon 3, sec. 19 of Title IV (captioned "Ecclesiastical Discipline") states, "Prior to the issuance of a Presentment or a determination not to issue a Presentment, as the case may be, *the matter shall be confidential*, except as may be determined to be pastorally appropriate by the Ecclesiastical Authority [defined to mean the Bishop of the Diocese]" (emphasis added). Canon 19, sec. 2 of the 1988 Canons of the Episcopal Diocese of Massachusetts states that "[a]ll matters of Ecclesiastical Discipline in this Diocese are governed by the provisions of Title IV of the Canons" of the General Convention of the Protestant Episcopal Church in the United States.

motion judge heard oral arguments on the motion to dismiss and allowed Hastie's motion for a protective order.

On April 7, 1997, the motion judge allowed Hastie's motion to dismiss as to both counts against her, allowed summary judgment for the Episcopal defendants as to counts III-XIII and count XVI, and denied summary judgment as to counts XIV and XV. The surviving assault and battery claim and the related loss of consortium claim filed by Mrs. Hiles were ordered remanded to the District Court.

*Discussion.* The rule regarding the exclusive jurisdiction of hierarchical religious organizations in religious matters is firmly embedded in the First and Fourteenth Amendments to the United States Constitution. The leading Federal case is *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 733 (1871) (civil court may not exercise jurisdiction over "a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them").

More recently, in *Serbian E. Orthodox Diocese for the U.S. & Can.* v. *Milivojevich,* 426 U.S. 696, 724-725 (1976), the Court wrote,

> "[T]he First and the Fourteenth Amendments permit *hierarchical religious organizations* to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them." (Emphasis added.)

Massachusetts cases are to the same effect. The "First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization." *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.,* 426 Mass. 268, 280 (1997), quoting from *Fortin* v. *Roman Catholic Bishop of Worcester,* 416 Mass. 781, 785, cert. denied, 511 U.S. 1142 (1994). *Fortin* also instructs that civil courts "must tread . . . cautiously" in disputes in-

volving hierarchical churches. *Id.* at 786-787, quoting from *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. 854, 861 (1981).

It is undisputed that the Episcopal Church is hierarchical in structure; "there are no judicial holdings to the contrary." *Parish of the Advent*, 426 Mass. at 282.[9] Nevertheless, tortious conduct is not necessarily beyond the reach of civil courts merely because such conduct occurs in a religious context. *Madsen* v. *Erwin*, 395 Mass. 715 (1985), upon which Hiles relies, involved the discharge of the plaintiff, a lesbian employee of the Christian Science Church. She sued the church and its trustees for defamation, wrongful discharge, and other claims of tortious conduct by the defendants. The Supreme Judicial Court held that, because the termination "for being gay . . . [was based on the] religious belief [of the defendants] that homosexuality is a sin for which one must repent," the imposition of liability in such a case "would burden the defendants' right to free exercise of religion." *Id.* at 725 (citation omitted). In dictum the court added, "we restate the equally important rule that the rights of religion are not beyond the reach of the civil law. . . . Under the banner of the First Amendment provisions on religion, a clergyman may not with impunity defame a person, intentionally inflict serious emotional harm on a parishioner, or commit other torts." *Id.* at 726-727 (citation omitted). It is this dictum to which the plaintiff points in particular.

That statement hardly controls this case, for here, Hiles, unlike the plaintiff in *Madsen*, was himself the subject of ongoing ecclesiastical disciplinary proceedings which were based upon the same statements that constitute the basis for the defamation

---

[9]Attachments to the motion to dismiss of the Episcopal defendants reveal the detailed provisions governing the tribunals established by the Episcopal Church to decide ecclesiastical disputes including those involving disciplinary matters such as the charges against Hiles. In his opposition, Hiles argued that St. Paul's was not a constituent part of the Diocese, that he was not an employee of the Diocese, and that therefore he was not subject to the jurisdiction of the disciplinary bodies of the Diocese. He has not pressed this point on appeal. Without doubt, then, the intervention of a civil court in ecclesiastical proceedings of the Episcopal Church concerning Hiles is foreclosed, leaving all secular matters "founded on the interpretation of the constitutional, common and statutory law . . . within the jurisdiction of the [civil] courts to determine." *Willitts* v. *Roman Catholic Archbishop of Boston*, 411 Mass. 202, 206 n.4 (1991).

claims brought by Hiles. Indeed, the defendants argue that while the gist of the action may be the tortious conduct of the defendants, that conduct arose out of Hiles's ongoing disciplinary proceedings before the tribunal of the Diocese which "necessarily involve[] matters of Church Doctrine and polity." Therefore, the argument continues, the complaint should be dismissed (except for the assault and battery count) lest the civil courts become "entangled" with the internal religious affairs of the Episcopal Church.

The sweeping generality of the argument of each side is unpersuasive. We will "tread . . . cautiously" before dismissing the complaint (as both *Fortin* and the liberal standards for evaluating dismissal motions instruct us to do) by analyzing each count of the complaint to determine whether the civil courts are precluded from asserting jurisdiction. See *Murphy* v. *I.S.K.Con. of New England, Inc.*, 409 Mass. 842, 857-858, cert. denied, 502 U.S. 865 (1991).

1. Count I alleges libel and slander against Hastie for having written, said and published in March, 1996, "with actual malice," false defamatory statements (regarding sexual misconduct) about Hiles. Based on the prior factual allegations of the complaint, this count refers, no doubt, to Hastie's letter to Shaw, which described her adulterous affair with Hiles some twenty years earlier and which was submitted to Shaw in accordance with procedures established by Title IV, Canon 3, sec. 3(e) (a charge of immorality may be made by the alleged victim).

We conclude that the trial court should not have declined jurisdiction on this count. The "First Amendment prohibits civil courts from *intervening* in disputes concerning religious doctrine, discipline, faith, or internal organization" (emphasis added), *Parish of the Advent*, 426 Mass. at 280, and from challenging the binding authority of a decision of the tribunal of the church regarding any such matter. *Serbian E. Orthodox Diocese*, 426 U.S. at 713. Neither of these prohibited actions has occurred or is likely to occur here.

The proceedings before the ecclesiastical tribunal are concerned with the disciplinary charges against Hiles. That dispute will focus on the conduct of Hiles and will be measured

by the applicable disciplinary Canons of the Diocese. The civil courts involved in this case have no jurisdiction or jurisprudence to measure the priestly conduct of Hiles, or to discipline him if his conduct is found to fall short of the mark. Whatever the outcome of the ecclesiastical proceedings against Hiles, it is important to recognize that this count questions the conduct of the defendant Hastie, not Hiles.

Assuming, as we must for the purpose of this appeal only, that Hastie's accusations were false, her publication of those false statements was a secular act, which, "although delivered in the milieu of religious practice . . . [was] used [allegedly] to cloak a secular purpose: in this case, to injure reputation." *Hester* v. *Barnett*, 723 S.W.2d 544, 559 (Mo. Ct. App. 1987). The core of Hiles's complaint against Hastie is her malicious publication of the allegedly false charges. That does not present what is "essentially . . . a religious dispute . . . ." *Parish of the Advent*, 426 Mass. at 284, quoting from *Serbian E. Orthodox Diocese*, 426 U.S. at 709. It is a secular dispute which may be adjudicated according to the established rules of common law and relevant statutes. The right of the Episcopal defendants to the free exercise of their religion, including the disciplinary and governance functions involved in the ecclesiastical proceedings, will not be impeded by the prosecution or outcome of these civil proceedings.[10] See *Marshall* v. *Munro*, 845 P.2d 424 (Alaska 1993) (although civil court had no jurisdiction over

---

[10]To say that the Hiles-Hastie dispute is secular in nature does not gainsay the fact that Hiles continues to be subject to the disciplinary proceedings initiated by the Diocese.

We note, however, that the circumstances of Hastie's accusations present the question whether her conduct was protected by a conditional privilege. See Restatement (Second) of Torts § 596 (1977) and comment e, which we set out below. That, however, is a matter "generally not raised by motion to dismiss under rule 12(b)(6)," *Madsen* v. *Erwin*, 395 Mass. at 727, and we do not discuss that issue further.

Section 596 provides, "An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Comment e. states, "The common interest of members of. religious . . . associations . . . is recognized as sufficient to support a privilege for communications *among themselves* concerning the qualifications of the offic-

breach of contract claim, it did have jurisdiction over defamation claim brought by one clergyman against another).

The allowance of the motion to dismiss count I of the complaint was error.

2. Count II (charging Hastie with conspiracy) incorporates the earlier allegations regarding Hastie's "contacts" with employees of the Diocese during which Hastie was "urged to write" the defamatory letter to Shaw for the purpose summarized above. The count also incorporates the earlier allegations regarding Hastie's involvement in a conspiracy with Shaw to vilify Hiles "because of his refusal to submit to unjust Diocesan demands to cooperate in the wrongful appropriation of his parish's funds by the Diocese."

Reading this count indulgently, as we must, its allegations, including the allegations incorporated therein, and in particular the statement to the press allegedly released by Shaw (see discussion of the press release, *infra*), are adequate to state a potentially cognizable claim, see *Schaer* v. *Brandeis University*, 432 Mass. 474, 486 (2000), quoting from *Brum* v. *Dartmouth*, 44 Mass. App. Ct. 318, 321 (1998), *S.C.*, 428 Mass. 684 (1999) (the "indulgent criteria [for assessing a motion to dismiss] have reduced a plaintiff's obstacle in surmounting a . . . failure to state a claim to a minimal hurdle"), and fall within the "common design" theory of civil conspiracy described in Restatement (Second) of Torts § 876(a) (1979) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . does a tortious act in concert with the other or *pursuant to a common design* with him") (emphasis supplied). *Kyte* v. *Philip Morris Inc.*, 408 Mass. 162, 166-167 (1990). See *Gurney* v. *Tenney*, 197 Mass. 457, 466 (1908); *Kurker* v. *Hill*, 44 Mass. App. Ct. 184, 188 (1998).

There was no need for the trial court to decline jurisdiction of this count. The allegations of a conspiracy to defame Hiles is not "essentially . . . a religious dispute," see *Parish of the Advent*, 426 Mass. at 284, quoting from *Serbian E. Orthodox Diocese*, 426 U.S. at 709; as in the case of count I, it is a secular dispute. It was error to dismiss count II.

ers and members and their participation in the activities of the society" (emphasis added).

3. Count III against Shaw alleges his participation in a conspiracy to vilify Hiles by publishing the defamatory statements of Hastie. For the reasons, and upon the authorities, described in our discussion of count II, there was no need for the trial court to decline jurisdiction of this count. Dismissal of this count was error.

4. Counts V and VI against Shaw allege violations of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11(H) and (I). Count V refers to Hiles's Federal (First Amendment) and State (art. 2 of the Declaration of Rights) constitutional right to assemble and worship with his parish which, based on other allegations in the complaint, had been prohibited by the Temporary Inhibition. Count VI refers to his Federal (First Amendment) and State (art. 16 of the Declaration of Rights) constitutional right to freedom of speech to discuss with others the ecclesiastical charges against him which also had been prohibited by the Temporary Inhibition. In both counts, the required "threat[], intimidation or coercion," see *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 564, cert. denied, 516 U.S. 931 (1995), was alleged to be the threat to bring formal charges against Hiles under the Canons of the Diocese.[11]

Since the alleged constitutional deprivations were exacted in accordance with procedures adopted by the Episcopal Church, see Title IV, Canon 1,[12] we see nothing that would justify the intrusion of the civil courts into the course of events which are the subject of the Temporary Inhibition. Those are proceedings entirely within the rules and doctrines of the Episcopal Church, and any protest by Hiles with respect to them must be lodged with the ecclesiastical courts, not the civil courts.

Our conclusion is reinforced by the provisions of Title IV, Canon 14, sec. 1, which provide in part, "Clergy who have voluntarily sought and accepted ordination in this Church have

---

[11]The constitutional rights implicitly asserted by Hiles were those regarding his "free exercise" right, and his right to free speech. We need not reach these issues, for the reasons stated in the text.

[12]Section 2(a) of Title IV, Canon 1, provides that the Bishop is authorized to issue a Temporary Inhibition. Section 2(d) provides that the person against whom a Temporary Inhibition has been issued may request a hearing before the Standing Committee, which must hold the hearing "at the earliest possible time, but not later than fourteen days after the date of receipt of the request."

given their express consent and subjected themselves to the discipline of this Church and *may not claim in proceedings under this Title constitutional guarantees afforded to citizens in other contexts*" (emphasis added). We decline to become entangled in the promises of Hiles to the Episcopal Church or in its ecclesiastical proceedings; they present a religious controversy only.

Because the defendants are entitled to judgment on this count as matter of law, the motion judge was correct in allowing summary judgment on counts V and VI.

5. Counts VII and VIII assert claims under the Massachusetts Civil Rights Act against the Standing Committee for approving the Temporary Inhibition and thereby affirming and ratifying Shaw's threats to bring formal proceedings against Hiles (see counts V and VI). For the reasons described in the preceding section 4, jurisdiction over these counts was properly declined. There was no error in the entry of summary judgment for the defendants on counts VII and VIII.

6. Count IX against Harris is essentially the same as the conspiracy allegations against Shaw in count III. Because Harris cosigned the allegedly defamatory March 28 letter to the Diocese (see discussion, section 8, *infra*), count IX states a potentially cognizable claim under the "common design" theory of civil conspiracy, and it was error to dismiss this count. See discussion, sections 2 and 3, *supra*.

7. Count X is a conspiracy charge against the Diocese. The mere conclusory allegation of participation in a conspiracy by the Diocese fails to state a claim. See *Kadar Corp.* v. *Milbury*, 549 F.2d 230, 233 (1st Cir. 1977), cited in *Kurker* v. *Hill*, 44 Mass. App. Ct. at 190. There was no error in allowing summary judgment on this count.

8. Count XI against Shaw and Count XII against Harris each bear the caption, "NEGLIGENCE." Each count refers to the defendant's "duty to conduct investigations in a reasonably prudent manner using reasonable discretion to avoid unfairly damaging the reputations of clergy members, and to provide due process and pastoral consideration to those against whom allegations have been made." This is not a description of any cognizable common law or statutory duty, and the plaintiffs'

brief does not provide us with any basis upon which we would recognize such a duty. If, under church Canons, such a duty exists, we would not become entangled in it; we certainly could not enforce it.

It is also alleged, however, that on or about March 28, 1996, Shaw and Harris distributed a letter to the clergy of the Diocese, which became "widely known throughout the Diocese and among the public at large," revealing that " 'formal charges of sexual misconduct' had been brought against . . . Hiles, and [that] . . . Hiles had been 'inhibited from exercising his priestly functions.' " A copy of the letter appears in the record, and the statements quoted in the complaint do in fact appear in the letter.[13]

Drawing all reasonable inferences favorably to the plaintiff, as we must, we infer from the complaint — and the plaintiffs' brief supports the inference — that the allegations against Hiles became "widely known . . ." because Shaw and Harris (as they acknowledge in their March 28 letter) disseminated the allegations through a press release.

Assuming, as we must, that Hastie's charges were false, the March 28 letter was defamatory and actionable, see *Jones* v. *Taibbi*, 400 Mass. 786, 792 (1987) (citations omitted) ("Absent a privilege, the republisher of a defamatory statement is subject to liability as if he had originally published it. . . . Liability for a defamatory statement may not be avoided merely by adding a truthful preface that someone else has so stated"), and we see no reason why jurisdiction should have been declined.

It is acknowledged that the letter was sent to all the clergy of the Diocese, and that the press release, which contained the same defamatory information, was distributed to the newspapers, evidently for the purpose of assuring a wide distribution of the defamatory material to the public.[14] See *Draghetti* v. *Chmielewski*, 416 Mass. 808, 813-814 (1994), holding that

---

[13]"The character of a pleading . . . is to be determined from its essential substance and not from its descriptive title or name." *Parry* v. *Parry*, 316 Mass. 692, 697 (1944), quoting from *Universal Adjustment Corp.* v. *Midland Bank, Ltd.*, 281 Mass. 303, 328 (1933).

[14]We express no opinion as to the availability, vel non, of a privilege in connection with the surviving counts.

distribution of a defamatory statement by a police chief to a newspaper of general circulation was not protected by the conditional privilege, "there being no official duty to report internal investigations to the press." As to the possible defense of privilege, see note 14, *supra.*

There are genuine issues of material fact which require further proceedings. We conclude that summary judgment dismissing counts XI and XII was error.

9. Count XIII against Shaw alleges slander. This count is limited to the meeting between Hiles and Shaw on or about December 23, 1995, see note 5, *supra.* Here the complaint alleges that Shaw called Hiles a "bully" and a "liar." While the complaint alleges a "publication," there is nothing in the description of the incident that refers to the presence of anyone other than Shaw and Hiles. There is no sufficient factual allegation regarding publication, and the count fails to state a claim. In his affidavit, Hiles alleged that Shaw's defamatory statements were made "in the presence of others," but this allegation fails to meet the specificity requirements of Mass.R.Civ.P. 56(e), 365 Mass. 825 (1974). Nonetheless, Hiles should be permitted to move to amend his complaint to specify the persons present, leaving the allowance of the motion in the discretion of the motion judge.

10. Count XIV is the claim for assault and battery. Hiles has appealed from the judge's order of remand to the District Court. In light of this opinion and in the interest of judicial economy, the order of remand to the District Court is vacated.

11. Count XV is the claim of Lauretta Hiles for loss of consortium and survives as a claim to relief ancillary to any other surviving count. As to this count also, the order of remand to the District Court is vacated.

12. Count XVI is the claim of Lauretta Hiles for intentional infliction of emotional distress. We agree with the motion judge that this count should be dismissed. See *Nancy P.* v. *D'Amato,* 401 Mass. 516, 521 (1988) ("The prevailing view among courts which have considered the question is that an absent family member may not recover for severe emotional distress caused by extreme and outrageous conduct directed at another family member").

*Conclusion.* As to counts I, II, III, IX, XI, and XII, the judgment is reversed. As to count XIII, the judgment is affirmed, but the plaintiff shall be permitted to move to amend his complaint. As to count XV (loss of consortium), the judgment is modified to provide that the scope of the claim shall extend to all of the other surviving counts. As to counts XIV and XV the order of remand to the District Court is vacated, and as so modified, the judgments on those counts are affirmed. As to the remaining counts (V, VI, VII, VIII, X, and XVI), the judgment is affirmed.

*So ordered.*