Hinkle, J.
The plaintiff in this case is an ordained minister of the Episcopal Church and an employee of the defendant Episcopal Diocese of Massachusetts. The defendants are the Episcopal Diocese of Massachusetts and the Rt. Rev. M. Thomas Shaw, the presiding bishop of the diocese. The plaintiff alleges that the defendants discriminated against her based on her gender, and that this resulted in her constructive discharge by her resignation. In their answers, the defendants deny the plaintiffs allegations and argue that this court lacks jurisdiction under the First Amendment to the United States Constitution and article 2 of the Massachusetts Declaration of Rights. The matter is now before the court on the defendants’ motion to dismiss or, in the alternative, for summary judgment. The motion is treated as one to dismiss for lack of subject matter jurisdiction under Mass.R.Civ.P. 12(b)(1). After a hearing, for the reasons set forth below, this motion is ALLOWED.
BACKGROUND
The facts of this case, as they appear in the record,[2] are as follows.
Sandy Williams, the plaintiff, at all times relevant to this action, was an ordained minister of the Episcopal Church and an employee of the defendant Episcopal Diocese of Massachusetts (“the diocese”). The diocese is the administrative body of the Episcopal Church in Massachusetts (“the Episcopal Church”). The defendant Rt. Rev. M. Thomas Shaw (“Bishop Shaw”) is the presiding bishop of the diocese.
In February 1989, the diocese hired the plaintiff for the position of Missioner for the Deaf for the Diocese of Massachusetts. Her employment began on June 1, 1989 as a half-time member of the bishop’s staff as *290 Missioner for the Deaf. She was to develop a diocesan ministry for the deaf and serve as vicar of St. Andrew’s Mission for the Deaf in Brookline. Her particular responsibilities included educating the diocese about issues affecting the deaf community, providing support to a congregation affected by deafness, directing the liturgical life of the deaf mission at St. Andrew’s and acting as liaison between that community and the diocese. Ex. 5 to Williams Aff.
Plaintiffs affidavit, summarized, states that plaintiff was employed by the local diocese for eight years. There is nothing in the record to show that her part-time status ever changed. Part of plaintiffs job was to advocate for the members of her congregation and defend their rights under civil and canon law. During her employment, the plaintiff claims she was treated differently from male ministers. The plaintiff claims she was paid “considerably less” than her similarly situated male colleagues. When she raised this issue, she was either ignored, had her salary and benefits frozen or reduced, or was told she had no civil or ecclesiastical right to question the treatment she received. Plaintiffs Aff. (dated Mar. 12, 1998) at pars. 1-3.[3]
More specifically, plaintiffs affidavit states that when she interviewed for her position at St. Andrew’s, she was given an information packet which contained a salary and benefit range. Plaintiffs offer letter of January 19, 1989[4] states that plaintiffs position is half-time and sets forth compensation and benefits. Ex. 1 to Williams Aff. Plaintiff claims the letter offered salary and benefit figures below the amounts in the information packet she had seen when interviewing for the position. After she complained about this, the amounts were increased, but remained below the amounts in the information packet. In plaintiffs February 7, 1989 letter accepting the diocese’s offer of employment, plaintiff sets out a salary and benefit package which is generally more generous than the one set out in the offer letter. According to the acceptance letter, the salary and benefit package discussed therein is in accordance with plaintiffs January 25, 1989 conversation with Bishop Johnson, the then-presiding bishop. Ex. 2 to Williams Aff. Over the next six years, the plaintiff received two raises, which totaled 8 percent.
Sometime before beginning working, plaintiff informed the diocese that, because of her newborn child, she would not travel much for a year but would require the full travel allowance because of the cost of Massachusetts insurance. The diocese agreed at first but then required the plaintiff to submit actual mileage statements. When the plaintiff complained to the diocesan treasurer, she was informed that she would no longer receive compensation for travel to and from St. Andrew’s. For the next two and one half years, the plaintiff received less than half her travel allowance. By 1992 her travel allowance was eliminated from the diocesan budget, but, she says, allowances for her male counterparts were not similarly eliminated.
On December 1, 1993, Bishop Johnson summoned plaintiff to his office and told her he would have to terminate her. Bishop Johnson alluded to complaints against plaintiff from staff members but was not specific. He did not allow plaintiff to review her personnel file “at that time.”[5] Based on advice from an attorney and several senior priests, plaintiff wrote a letter dated January 28, 1994, requesting clarification and information from her personnel file. Williams Aff. at pars. 28-30; Ex. 12 to Williams Aff.
On March 12, 1994, Bishop Shaw was elected to replace Bishop Johnson, who was due to retire. Shortly thereafter, the plaintiff discussed with Bishop Shaw her claim of discrimination and stated that she was considering taking legal action against the diocese. Bishop Shaw expressed his desire to work with plaintiff to solve the problems. Plaintiff met with Bishop Shaw in December 1994 and again stated her concerns about inequitable salary and the relationship between herself and the diocese. Bishop Shaw referred plaintiff to his new archdeacon, Mark Hollingsworth, to discuss her salary. The Bishop also assured plaintiff that he and she would develop better communication and working relations.
Plaintiff met with Rev. Hollingsworth a few days later and asked that her salary be placed at the diocesan standard. She requested his help in obtaining funds for certain operating expenses. Hollingsworth said he would try to assist. He later informed plaintiff that reimbursement expenses were not available. Plaintiff did not hear from him again regarding these issues. Williams Aff. at pars. 33-35. Plaintiff received regular raises for the next two years, but does not believe she was ever raised to the diocesan minimum standard or the level of her male counterparts. Williams Aff. at par. 40.
In a letter to Bishop Shaw dated October 23, 1996, plaintiff expressed a desire to move the St. Andrew’s mission from Brookline to Danvers. Plaintiff understood there was a possibility of a gift of land in Danvers adjacent to two deaf institutions and a shift in the deaf population to the North Shore. On February 28, 1997, plaintiff met with Bishop Shaw and Rev. Hollingsworth. During the meeting she discovered that Bishop Shaw intended to establish a committee of outside consultants, excluding plaintiff, to assess the direction of plaintiffs ministry. Williams Aff. at pars. 41-42.
Plaintiff consulted “deans”[6] of the areas of Brook-line and the North Shore, where plaintiff claims the deaf ministry was most active. She also consulted with an Hispanic missioner, who had worked with Bishop Shaw to develop for his congregation an evaluation process directed by the missioner, in contrast to the manner in which plaintiff was treated. Based on these consultations, plaintiff wrote a letter dated March 21, *291 1997,[7] in which, among other things, she asked that the evaluation of her ministry be modeled after the process used for evaluation of the Hispanic ministry. She also communicated with Mary Meader, a psychologist and assistant to the Bishop for Pastoral Concerns, regarding her alleged discrimination.
On April 21, 1997, plaintiff wrote her resignation letter[8] to Bishop Shaw, who accepted the resignation a month later. Plaintiffs resignation was to be effective July 31, 1997. Williams Aff. at par. 59. Plaintiff learned that Bishop Shaw intended to proceed with the evaluation of her ministry despite her resignation and plaintiff again asked him to stop. Williams Aff. at pars. 49-51.
On June 22, 1997, Bishop Shaw telephoned plaintiff, saying he was “furious” that she had challenged his authority. He ordered plaintiff not to communicate with anyone on his staff, said he knew people in the deaf community and believed plaintiff had “abused [her] pastoral responsibility.” Williams Aff. at par. 55. Plaintiff told Bishop Shaw she believed his treatment of her was an extension of the abuse she had received for years from the diocese, and she said she wanted restitution for this abuse. Bishop Shaw said he would have someone contact her about the situation, “per administrative policies." Williams Aff. at pars. 54-58.
Plaintiff received no pay after her July 1997 check. She understood that she was to receive accumulated vacation pay and other pay in August. The record suggests that under a "mutual termination” the diocese severance benefits include a week of pay for each year of service to the diocese. Ex. 19 to Williams Aff. Plaintiff was not contacted further about her complaints of discrimination or her request for restitution. Plaintiff says she had no further contact with the diocese staff, as ordered by Bishop Shaw. Williams Aff. at pars. 58-60.
St. Andrew’s accedes to the Constitution and Canons of the Protestant Episcopal Church in the United States and of the Protestant Episcopal Diocese of Massachusetts and acknowledges their authority. The Constitution of St. Andrew’s, Article VI, provides that the minister-in-charge at St. Andrew’s “shall be appointed and may be removed by the Bishop of the Diocese.”
The Personnel and Administrative Policies with Equal Employment Policy and Affirmative Action Guidelines (Sept. 1, 1993) of the diocese state, in relevant part:
The Diocese of Massachusetts is committed to nondiscriminatory and equal opportunity employment for all persons without regard to race, color, sex, age, nonlimiting physical or mental handicap, actual or suspected HIV infection or a diagnosis of AIDS or ARC or national origin.
Ex. 20 to Williams Aff., p. 21.
The policies (p. 1) also state:
Policies may be altered from time to time; policies may be added or withdrawn. These personnel and administrative policies do not constitute an employment contract.
As to enforcement of the policies, those policies (pp. 12, 22) provide:
The Diocese operates in accordance with the Equal Employment Policy “Affirmative Action Guidelines” as appended to these Personnel Policies. All hiring follows these principles.
All promotion practices and merit decisions are reviewed annually by the Personnel Committee . . .
Any employee having a complaint concerning the implementation of these affirmative action guidelines is encouraged to utilize the normal channels as stated in the Personnel and Administrative Policies![9]] to identify the nature of the problem and to resolve it. If the use of these channels does not resolve the problem, the employee may place the matter before the Bishop for referral to the Personnel Committee. This Committee shall make a confidential investigation of the situation and make a recommendation to the Bishop with respect thereto as it deems appropriate . . .
[ ] The Personnel Committee should semi-annually (June and December) conduct analysis of all personnel employed by the Diocese of Massachusetts which may include a review of:
1. The current patterns of employment at all levels in all staff groups . . .
2. Promotion practices and merit decisions as they relate to the Affirmative Action Guidelines;
3. Any grievances or terminations which bear upon this policy . . .
In her brief, plaintiff purports to quote from the National Constitution & Canons of the Episcopal Church. The relevant portions are not in the record. I assume, only for purposes of this motion, that the plaintiff is correct in her assertion that the canons state as follows:
No one shall be denied rights, status, or access to an equal place in the life, worship, and governance of this Church because of race, color, ethnic origin, marital status, sex, sexual orientation, disabilities or age.
(1994, Canon 17, Sec. 5.)
No one shall be denied access to the selection process for ordination in this Church because of race, color, ethnic origin, sex, national origin, marital status, sexual orientation, disabilities or age.
(1994, Canon 4, Sec. 1.)
On September 16, 1999, the plaintiff filed a complaint with the Massachusetts Commission Against Discrimination (“the MCAD”) charging defendants with harassment, discrimination and retaliation.[10] In *292 July 2000, the MCAD allowed plaintiffs motion to remove the complaint to this court. This complaint followed.
The complaint contains three counts.[11] Count I alleges against the diocese violations of the Massachusetts antidiscrimination statute, G.L.c. 15 IB; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.; provisions of the Fair Labor Standards Act of 1938, 29 U.S.C. §§206(d) & 216; and G.L.c. 149, §105A. More specifically, Count I alleges that the defendants failed to provide the plaintiff with employment conditions free of gender discrimination, failed to respond promptly to the plaintiffs complaints of gender discrimination, failed thoroughly to investigate the plaintiffs complaints of gender discrimination, failed to compensate the plaintiff “consistent with that given to male ministers similarly situated” and retaliated against the plaintiff after she complained about disparate treatment. Count II alleges against Bishop Shaw violations of G.L.c. 15 IB and Title VII, in part by aiding and abetting unlawful and discriminatory practices. Count III alleges against Bishop Shaw violation of G.L.c. 15 IB, §4(4), which prohibits retaliatory behavior. The complaint seeks compensatory and punitive damages, attorneys fees, interest and costs.
In August 2000, defendants removed the case to the local Federal Court (Civ. No. 00-CV-11758). Subsequently, plaintiff dismissed all her Federal claims, and the case was remanded to this court. This motion followed.
DISCUSSION
1. Standard to Be Applied
The defendants’ motion is titled a motion to dismiss or, alternatively, for summary judgment, pursuant to Mass.R.Civ.P. “12(b)(2)(6)” or Rule 56. A review of the case law, however, shows that the First Amendment grounds on which defendants principally rely have the effect of depriving a court of jurisdiction to hear a case. See, e.g., Antioch Temple, Inc. v. Parekh, 383 Mass. 854, 858 n.4 (1981). Thus, I treat this aspect of the defendants’ motion as a motion to dismiss for lack of subject matter jurisdiction under Mass.R.Civ.P. 12(b)(1). Since the plaintiff did not object to consideration of the defendants’ motion as a motion for summary judgment, and, indeed, filed a response to the defendants’ statements of material facts, consideration of matters outside the pleadings does not prejudice plaintiff.[12] In addition, as noted, numerous exhibits are attached to plaintiffs affidavit, and in her brief plaintiff quoted canons that do not appear in the pleadings (or anywhere in the record).
The burden of proof on a motion to dismiss for lack of subject matter jurisdiction rests with the plaintiff. Brown v. Tobyne, 10 Mass.App.Ct. 833, 833 (1980). In this case, as noted above, the record before me includes plaintiffs lengthy affidavit expressly incorporated by reference into the complaint and other documents. These documents, together with the Statement of Material Facts, provide an adequate record for resolution of the pending motion. For this motion only, I make all reasonable inferences in favor of plaintiff.
2. The First Amendment Issue
The defendants’ first and their principal argument is that the First Amendment to the United States Constitution and art. 2 of the Massachusetts Declaration of Rights bar this court from exercising jurisdiction.
The First Amendment provides in relevant part:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . .
Article 2 of the Massachusetts Declaration of Rights provides:
It is the right as well as the duty of all men in society, publicly, and at stated seasons to worship the Supreme Being, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping God in the manner and season most agreeable to the dictates of his own conscience; or for his religious profession or sentiments; provided he doth not disturb the public peace, or obstruct others in their religious worship.
It is well established that the First Amendment, through the Fourteenth Amendment, places limitations on this court’s ability to intervene in church disputes. E.g., Serbian E. Orthodox Diocese for the United States & Canada v. Milivojevich, 426 U.S. 696, 713 (1976); Parish of the Advent v. Protestant Episcopal Diocese of Mass., 426 Mass. 268, 283 (1997). A civil court may not exercise jurisdiction over “a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.” Watson v. Jones, 80 U.S. (13 Wall.) 679, 733 (1872), quoted in Serbian E. Orthodox Diocese, 426 U.S. at 714. Stated differently, “the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization.” Alberts v. Devine, 395 Mass. 59, 72 (1985), quoted in Parish of the Advent, 426 Mass. at 280.
Thus, the Supreme Court has held:
[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals![13]] are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.
Serbian E. Orthodox Diocese, 426 U.S. at 724-25. There is no dispute that the Episcopal Diocese of *293 Massachusetts is a hierarchical religious organization. See also Parish of the Advent, 426 Mass. at 281; Hiles v. Episcopal Diocese of Mass., 51 Mass.App.Ct. 220, 227 (2001). The question is whether the present dispute falls within that class of disputes for which the First Amendment bars civil court jurisdiction.
Based on established First Amendment principles, Federal courts have fashioned what has become known as the “ministerial exception.” The effect of this doctrine is to “precluded civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them.” Equal Employment Opportunity Comm'n v. Catholic Univ. of Am., 83 F.3d 455, 461 (D.C.Cir. 1996). The source of this doctrine is constitutional, not statutory.[14] It is based on the Free Exercise Clause (perhaps in conjunction with the Establishment Clause)[15] of the First Amendment. E.g., Natal v. Christian & Missionary Alliance, 878 F.2d 1575, 1578 (1st Cir. 1989). See also Catholic Univ. of Am., 83 F.3d at 461; Starkman v. Evans, 198 F.3d 173, 177 (5th Cir. 1999), cert. denied, 121 S.Ct. 49 (2000); Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 (8th Cir. 1991); McClure v. Salvation Army, 460 F.2d 553, 560 (5th Cir.), cert. denied, 409 U.S. 896 (1972), cited in Madsen v. Erwin, 395 Mass. 715, 733 (1985) (O’Connor, J., concurring in part and dissenting in part).
This doctrine was first articulated in 1972 by the Fifth Circuit in McClure, 460 F.2d at 560-61. It has survived changes in the Supreme Court’s Free Exercise Clause jurisprudence. See Combs v. Central Tex. Annual Conference of the United Methodist Church, 173 F.3d 343, 348-49 (5th Cir. 1999). A significant limitation on the doctrine is that it applies only to “ministers” and not to persons who perform tasks not traditionally ecclesiastical or religious.[16] See Starkman, 198 F.3d at 175. The ministerial exception has been applied, in substance if not by name, in most Federal circuits and in State courts. See Combs, 173 F.3d at 347 (citing cases); Schmoll v. Chapman Univ., 70 Cal.App.4th 1434 (1999), rev. denied, Sup.Ct. Minute 06-16-99; Newport Church of the Nazarene v. Hensley, 161 Or.App. 12, rev. allowed, 329 Or. 447 (1999); Van Osdol v. Vogt, 908 P.2d 1122 (Colo. 1996).
Given the widespread acceptance of the ministerial exception, including its application by the First Circuit, I apply that doctrine in this case.[17] McClure stated the reasoning for the ministerial exception:
The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister’s salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church ...
An application of the provisions of Title VII to the employment relationship which exists between The Salvation Army and Mrs. McClure, a church and its minister, would involve an investigation and review of these practices and decisions [(i.e., minister’s assignment, salary, and duties)] and would, as a result, cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern . . .
Moreover, in addition to injecting the State into substantive ecclesiastical matters, an investigation and review of such matters of church administration and government as a minister’s salary, his place of assignment and his duty, which involve a person at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment.
McClure, 460 F.2d at 558-59, 560.
Thus, McClure recognized a twofold basis for the ministerial exception: it avoids court inquiry into substantive church doctrine and ecclesiastical matters, and, apart from this, inquiry into the basis by which a church makes employment decisions concerning its ministers may impinge on rights guaranteed by the Religion Clauses of the First Amendment. See also Scharon, 929 F.2d at 363.
Significantly, courts have held that the First Amendment bars suit even where the challenged church actions are not based on religious doctrine. See Combs, 173 F.3d at 351. In Combs, the parties agreed that the minister’s claims were “based purely on sex and pregnancy and [did] not directly involve matters of religious dogma or ecclesiastical law.” Id. at 345 n. 1. The court assumed that the minister’s allegations were sufficient to support a finding of discrimination. Nevertheless, citing the second of McClure’s concerns, the Fifth Circuit held:
[I]n investigating employment discrimination claims by ministers against their church, secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged discrimination were purely nondoctrinal. . . This second concern alone is enough to bar the involvement of the civil courts.
Combs, 173 F.3d at 350. See also Starkman, 198 F.3d at 175 n.1 & 177 (choir director’s suit barred even though no attempt to justify dismissal on religious or nondiscriminatory grounds).
In this case, even though plaintiff asserts in her affidavit incorporated by reference in the complaint that her claims do not “focus” on ecclesiastical dis *294 putes or disputes concerning religious doctrine, discipline, faith or internal organization, the facts she puts forth in detail in her affidavit belie this assertion. For example, plaintiff states part of her job as an ordained minister was to defend her congregation’s rights under canon law. Part of the adverse conduct plaintiff alleges she was subjected to includes “tampering with the canonical rights of the congregation.” Williams Aff. at par. 25. She claims disparate treatment in the determination of the direction of her parish. She believes Bishop Shaw’s predecessor, Bishop Johnson, disliked her because she, a woman, challenged his authority with regard to her congregation’s rights. She states that Bishop Shaw accused her of abusing her pastoral responsibility and that Bishop Johnson abused his control and power over her.
These statements, to provide a basis on which a finding of discrimination can be made, require a journey into church doctrine which the First Amendment forbids. What were plaintiffs congregation’s rights under canon law? What right did defendants have to determine the direction of plaintiffs congregation, and what concerns peculiar to plaintiffs ministry to the deaf might influence this decision? What is the appropriate balance, if any, a minister must strike between being subordinate to a bishop and an advocate for her congregation? What was plaintiffs pastoral responsibility, and did she, in fact, under church doctrine, exceed that? Or was it the bishops and the diocese that exceeded their authority? Questions such as these cannot in this case be answered without reference to church doctrine.
Even if this court were to strip away all the issues in this case which on their face require some analysis of church doctrine, the First Amendment would still bar this suit. For the reasons stated in Combs, 173 F.3d at 350-51, investigation of this discrimination claim would intrude into church government in an inherently coercive manner.
The recent decision of the Appeals Court in Hiles, 51 Mass.App.Ct. 220, does not require a different result. In relevant part, the plaintiff minister in Hiles alleged that the bishop participated in a conspiracy to vilify him by publishing defamatory statements. Id. at 231. Publishing the statements by sending a press release would not be employment discrimination but the tort of defamation. Notably, the Appeals Court in Hiles affirmed dismissal of alleged violations of the Massachusetts Civil Rights Act, G.L.c. 12, §§11(H) & (I), because the alleged constitutional deprivations were exacted in accordance with church procedures, and protest was not appropriately lodged in the civil courts. Hiles, 51 Mass.App.Ct. at 231.[18]
The Supreme Judicial Court recently reaffirmed that, based on a theory of consent, courts should defer to certain decisions of hierarchical churches:
First Amendment considerations aside, such deference to the hierarchical tribunal is justified by general principles of private ordering. As explained by the United States Supreme Court, “[a]ll who unite themselves to [a general church] do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have [it] reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.”
Parekh, 383 Mass. at 861 n.8, quoted in Parish of the Advent, 426 Mass. at 281 n.25.
In sum, for the reasons stated above, I rule that the First Amendment bars plaintiffs claims under G.L.c. 15 IB. I therefore do not reach the art. 2 ground defendants assert, but do not discuss, in their brief.
3. The Statutes of Limitations Issues
In addition to their constitutional argument, defendants argue that this action is time-barred. Plaintiff responds that defendants’ discrimination was continuing, culminating in her not receiving the compensation she claims she was promised after July 31, 1997. At the hearing on this motion, plaintiff conceded that her claims under G.L.c. 149 were time-barred. Because of the result I reach on First Amendment grounds, I do not address the remaining limitations issues.
ORDER
For the foregoing reasons, defendants’ motion to dismiss or in the alternative for summary judgment is ALLOWED.

 I have considered the pleadings, including the plaintiffs lengthy affidavit dated March 12, 1998 attached to the complaint and expressly incorporated by reference therein. The affidavit refers to various attached exhibits. Those exhibits were not attached to the complaint but, upon this court's request, were provided and have been considered. The defendants have attached a number of exhibits to their brief in support of their motion. The plaintiff has not objected to these exhibits and has not moved to strike them. With the exception of Exhibit 5, I have considered those documents whose authority is not disputed, under the standard set out in the discussion section of this decision. I have disregarded assertions unsupported in the Defendants' Statement of Material Facts. As noted below, I draw all reasonable inferences in plaintiffs favor.

 Although I discuss plaintiffs affidavit in detail, I make no findings about the accuracy of her assertions. I consider the facts in plaintiffs affidavit to be accurate only for the purpose of deciding the present motion. I disregard her assertions stated on information and belief and others which are merely conclusory characterizations.

 There appears to be some discrepancy as to the date of the letter. Plaintiffs affidavit (par. 6) states that the letter is dated January 19, 1989. The letter itself is dated January 19, *295 1988. Ex. 1 to Williams Aff. Plaintiffs cover letter to the supplemental submission of the affidavit exhibits (dated June 6, 2001). states that the plaintiffs affidavit “mis-name[s]" the date of Ex. 1 as Jan. 19, 1989, and the letter says the date should be Jan. 19, 1988. The record suggests that the events surrounding plaintiffs offer, and subsequent acceptance, of employment with the diocese occurred in 1989. The letter itself states that plaintiffs employment begins June 1, 1989. It is, therefore, the letter which appears to misstate the date as 1988 rather than 1989. One other letter in the record from Bishop Johnson to plaintiff obviously misstates years. See Ex. 19 to Williams Aff. (letter dated Dec. 1993 stating events to occur in April and June “1993”). Whether the correct date is 1988 or 1989 is immaterial.

 Bishop Johnson sent plaintiff a letter dated December 16, 1993, stating a termination date of June 30, 1994 “unless there is sufficient evidence of a change in [plaintiffs] performance that would warrant continuation of [plaintiffs] work.” Ex. 19 to Williams Aff.

 The record is unclear as to the identity of these individuals or their role, if any, in the church hierarchy.

 This letter is to Bishop Shaw and Hollingsworth. In part, the letter states:
Regarding our meeting on February 28th, I’ve had an opportunity to think and pray about the evaluation process that we discussed. I'd like to share some ideas with you.
I have two concerns:
First, I feel it is important that any process that defines a ministry’s goals and vision must involve the people themselves. Every congregation has the right to self-determination.
Second, I believe that the Diocesan Missioner to the Deaf should provide the leadership to any evaluation. In order to “own” the outcome the Missioner needs to lead the process. To bring in outside consultants to do this just further undermines the authority of the Diocesan Missioner to the Deaf.
Ex. 4 to Deis.’ Brief.

 A copy of this letter is attached to defendants’ brief as Ex. 5.

 These “normal channels” do not appear to be contained in the policies currently in the record.

 The defendants deny that the charges were filed timely.

 The complaint alleges:
During the entire eight year period of her employment and on a continual basis, Plaintiff was discriminated against and treated disparately based on her sex, including, but not limited to, her rate of pay and benefits when compared to male ministers similarly situated, in violation of M.G.L.c. 15IB. When she complained about the disparate treatment, Plaintiff was admonished and threatened with termination. As a result of the hostile work environment in which she was forced to work, she was constructively discharged by resigning on July 31, 1997 (attached to this Complaint as Exhibit A and incorporated by reference herein, is the affidavit of the Plaintiff concerning the relevant facts).
The defendants deny these allegations.

 Consideration of materials outside the pleadings is permitted under Rule 12(b)(1). See Bell v. Zoning Bd. of Appeals of Gloucester, 429 Mass. 551, 555 (1999).

 There is no dispute in this case that the Episcopal Church has ecclesiastical tribunals. See Hiles v. Episcopal Diocese of Massachusetts, 51 Mass.App.Ct. 220, 225, 227 n.9 (2001). The record before me does not reveal how, if at all, those tribunals address discrimination disputes. The Personnel Policies of the diocese contain mechanisms by which employees can seek to resolve problems. The record does not reveal whether, or to what extent, plaintiff attempted to resolve her claims through the procedure provided by the diocese. Neither of the parties has addressed this issue.

 The doctrine is termed an “exception” because it is an exception to Title VII carved out by the courts so as not to run afoul of the First Amendment. McClure v. Salvation Army, 460 F.2d 553, 560-61 (5th Cir. 1972).
Plaintiff argues in part that this court need not follow the ministerial exception cases, because plaintiff does not assert a violation of Federal law. The thrust of plaintiffs argument appears to be that these cases are based on an interpretation of Title VII. If this is plaintiffs argument, it is contradicted by the case law.
Plaintiff also argues that G.L.c. 15 IB creates as a statutory affirmative defense that a church's discriminatory employment decision is permitted under its doctrine. This, the plaintiff argues, is the only affirmative defense available, and thus an employment decision not permitted under church doctrine would not be protected. The relevant language of c. 15IB is contained in the definition of “employer”:
[Nlothing herein shall be construed to bar any religious or denominational institution or organization. .. from taking any action with respect to matters of employment, discipline, faith, internal organization, or ecclesiastical rule, custom, or law which are calculated by such organization to promote the religious principles for which it is established or maintained.
G.L.c. 151B, §1(5).
Because the result I reach is based on Federal constitutional principles, I need not decide if plaintiff is correct.

 At times, it is difficult to discern whether a court’s holding is based on the Free Exercise Clause, the Establishment Clause or both.

 There is no dispute that the plaintiff in this case is a “minister.”

 In so doing, I omit the analysis in the decisions applying the ministerial exception demonstrating how the exception derives from the First Amendment. Nothing is gained by repeating that analysis here. Plaintiffs arguments based on the Free Exercise Clause fail for the reasons stated in those cases. It is unclear to what plaintiff is referring when she argues, “Massachusetts law, specifically [C.151B], states that a balancing test must be used.” Pl.’s Brief at 9. From context, it appears to refer to the First Amendment. That argument is addressed in the ministerial exception cases. Similarly, the Religious Freedom Restoration Act, 42 U.S.C. §2000bb et seq., on which the defendants’ partly rely, was addressed in, e.g., Combs, 173 F.3d at 348-50. See City of Boerne v. Flores, 521 U.S. 515 (1997) (holding Act unconstitutional).
The one aspect of plaintiffs First Amendment argument that does bear brief discussion is her contention that her constructive discharge reflects arbitrary and capricious actions and decisions by defendants. In Serbian E. Orthodox Diocese, 426 U.S. at 713, the Supreme Court stated:
We have concluded that... no ‘arbitrariness’ exceptionin the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulationsis consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law.
Whatever arbitrariness exception survives Serbian E. Orthodox Diocese, the defendants’ actions and decisions do not *296 fit within this exception and are squarely addressed by the ministerial exception cases.

 A related and growing body of law concerns whether the First Amendment bars judicial inquiry into details of the church-minister relationship when grave harm results to third parties. See, e.g., Leary v. Geoghan, Suffolk Civ. No. 99-0371 (Mem. & Order on Mot. to Dismiss dated June 28, 2000) (McHugh, J.), 2000 WL 1473579. The facts in the present record place this case well outside that body of law.