JAMES R. HILES & another[1] *vs.* EPISCOPAL DIOCESE OF
MASSACHUSETTS & others.[2]

Middlesex. February 4, 2002. - August 15, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Jurisdiction,* Ecclesiastical controversy. *Libel and Slander. Conspiracy.
Practice, Civil,* Dismissal.

A claim of defamation brought by an Episcopal priest against a female
  parishioner who had made allegations of sexual misconduct against the
  priest constituted, in the circumstances, an ecclesiastical matter arising out
  of the church-minister relationship in the religious discipline context;
  consequently, a Superior Court judge correctly dismissed the claim on
  jurisdictional grounds. [511-515]
On motions supported by affidavits pursuant to Mass. R. Civ. P. 12 (b) (1) to
  dismiss a complaint by an Episcopal priest, alleging a civil conspiracy on
  the part of the Episcopal Diocese of Boston and church officials, for lack
  of subject matter jurisdiction, the judge correctly declined jurisdiction,
  where the court would have been required to intrude into rules, policies,
  and decisions that were unmistakably of ecclesiastical cognizance.
  [515-516]
In a civil action brought by an Episcopal priest against the Bishop of the
  Episcopal Diocese of Boston and the standing committee of the diocese, a
  Superior Court judge correctly declined to accept jurisdiction of the
  plaintiff's civil rights claims under G. L. c. 12, §§ 11H, 11I, as the claims
  presented a matter of church discipline, a religious controversy under the
  exclusive jurisdiction of the Episcopal Church. [516-517]
A Superior Court judge correctly declined jurisdiction of claims by an
  Episcopal priest that church officials were negligent in their duty to conduct
  investigations into allegations by a parishioner against the priest by
  republishing details of a letter in a press release, where there was no show-
  ing by the plaintiff that church officials were acting outside the purview of
  the church's disciplinary procedures when issuing the press release.
  [518-519]

---

[1]Lauretta R. Hiles.

[2]Linda M. Hastie; M. Thomas Shaw, Third, individually and as Bishop of
the Episcopal Diocese of Massachusetts; Barbara C. Harris, individually and
as Suffragan of the Episcopal Diocese of Massachusetts; and the standing
committee of the Episcopal Diocese of Massachusetts and its members, both
individually and as members thereof, namely, F. Davis Dassori, Jr.; David A.
Killion; Robert Bacon; Diane M. Edson; Byron Rushing; Cathy H. George;
and Marjorie A. Burke. Members of the standing committee are collectively
referred to as the standing committee.

A Superior Court judge correctly dismissed a claim of slander in the absence of publication of a defamatory matter to a third person. [519]

CIVIL ACTION commenced in the Superior Court Department on May 13, 1996.

Motions to dismiss were heard by *Wendie I. Gershengorn,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*William F. Looney, Jr.* (*Charles P. Kindregan, Jr.,* with him) for Episcopal Diocese of Massachusetts & others.

*Clyde D. Bergstresser* for Linda M. Hastie.

*Stephen C. Hoctor* for the plaintiffs.

*Gregory S. Baylor,* of Virginia, for Christian Legal Society & others, amici curiae, submitted a brief.

SPINA, J. James R. Hiles, an Episcopal priest, and Lauretta R. Hiles, his wife, filed a sixteen-count amended complaint against the Episcopal Diocese of Massachusetts and others, alleging defamation, conspiracy, interference with contractual relations, civil rights violations, negligence, assault and battery, intentional infliction of emotional distress, and loss of consortium. On motions to dismiss filed under Mass. R. Civ. P. 12 (b) (1), (2), and (6), 365 Mass. 754 (1974), a judge in the Superior Court dismissed all but two counts of the complaint; a count for assault and battery and the corresponding count for loss of consortium survived. The counts against Linda M. Hastie for defamation and conspiracy were dismissed for lack of subject matter jurisdiction, pursuant to rule 12 (b) (1), on the ground that the facts alleged in the complaint related to ecclesiastical discipline, an activity that is absolutely protected by the First Amendment to the United States Constitution. Summary judgment was granted for other defendants on twelve counts pursuant to rule 12 (b), seven on First Amendment (jurisdictional) grounds and five under the summary judgment standard. The Hileses appealed to the Appeals Court, which reversed the judgment, in part, by reinstating the counts against Hastie, and reinstating the counts against M. Thomas Shaw, Third, Bishop

of the Diocese[3]; and Barbara C. Harris, Suffragan Bishop of the Diocese, for conspiracy and negligence. See *Hiles* v. *Episcopal Diocese of Mass.*, 51 Mass. App. Ct. 220 (2001). We granted applications for further appellate review, one filed by Hastie, and the other filed by Shaw and Harris, and now affirm the judgment of the Superior Court, with minor changes as to the form of the judgment on certain counts.

1. *Background.* We summarize the allegations from the amended complaint, supplemented by undisputed facts set forth in affidavits filed in support of, and in opposition to, the motions to dismiss. Hiles was ordained a priest of the Episcopal Church in 1958. He has served as vicar of the Church of Our Saviour, an Episcopal mission in Milton, since about 1970, and also as rector of St. Paul's Episcopal Church, an Episcopal parish in Brockton, since about 1975. Both churches are constituent parts of the Episcopal Diocese of Massachusetts (Diocese).

The bylaws of each church state that it is bound by and accedes to the constitution and canons of the Diocese and of the national Church.[4] The constitution and canons of the Diocese state that the Diocese "accedes to the . . . discipline and . . . the Constitution and Canons of the Episcopal Church in the United States of America." The constitution and canons of the national Church provide a detailed and comprehensive procedure for the discipline of members of the clergy, including priests.[5]

---

[3]Hiles did not make any argument on appeal as to the judgment dismissing count 4, which had alleged interference with contractual relations by Shaw. Any issue as to the judgment on count 4 is deemed waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[4]In April, 1996, St. Paul's amended its bylaws, deleting the provision concerning accession to hierarchical authority. The parties do not argue that this would affect the outcome.

[5]Title IV, Canon 14, §§ 1 and 2, state: "Ecclesiastical Nature. Disciplinary proceedings under this Title are neither civil nor criminal, but ecclesiastical in nature and represent determinations by this Church of who shall serve as Members of the Clergy of this Church and further represent the polity and order of this hierarchical Church. Clergy who have voluntarily sought and accepted ordination in this Church have given their express consent and subjected themselves to the discipline of this Church and may not claim in proceedings under this Title constitutional guarantees afforded to citizens in

The Episcopal Church is a hierarchical religious organization.[6] See *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 281 (1997).

In 1990, the Church of Our Saviour (mission) received a bequest of more than $2 million from one of its members, Harriet Brierly Mears. The Diocese demanded that the mission surrender this money, but it refused. The matter became the subject of litigation in the Probate Court, the outcome of which is immaterial to the issues in this appeal. On at least two occasions Shaw asked Hiles to use his influence to end the litigation and persuade the mission to turn over the Mears' bequest to the Diocese. Hiles remained neutral in the dispute, and never recommended that the mission act contrary to ecclesiastical law. Hiles alleged in his complaint that on December 23, 1995, Shaw summoned Hiles to his office, accused him of being stubborn, a bully, and a liar, and struck him with a pen. He also alleged that Shaw warned that he needed to be "taught a lesson on authority and obedience" and expressed his intention to remove Hiles as vicar of that church.

On March 26, 1996, Hastie submitted a letter to Shaw stating that, while she was a parishioner of Hiles, she and Hiles had a sexual relationship that began in the spring of 1970 and lasted until late 1975. Shaw summoned Hiles to his office on March 27, 1996, and informed him of the details of Hastie's letter. Shaw advised Hiles that he had informed the standing committee of the Diocese of the nature and allegations of Hastie's letter, "without judgment or comment upon the allegations or guilt," in accordance with Title IV, Canon 3, § 5, of the constitution and canons of the national Church,[7] and that, under the Constitution and canons, an investigation would be

other contexts."

"Resort to secular courts. No Member of the Clergy of this Church may resort to the secular courts for the purpose of delaying, hindering or reviewing any proceeding under this Title."

[6]The judge made this finding, and it is not disputed.

[7]Title IV, Canon 3, § 5, states: "Whenever the Bishop has sufficient reason to believe that any Priest . . . canonically resident in that Diocese has committed an Offense and the interests and good order and discipline of the Church require investigation by the Standing Committee, the Bishop shall concisely and clearly inform the Standing Committee in writing as to the nature and facts surrounding each alleged Offense and the specifications of

undertaken. Shaw then placed Hiles under a temporary inhibition prohibiting him from functioning as a priest pending the outcome of the disciplinary proceedings, pursuant to Title IV, Canon 1, § 2 (a), of the national Church canons. Shaw also ordered Hiles not to communicate with Hastie or disclose or discuss any details of the case with anyone except those persons involved in the disciplinary process, his spouse, legal counsel, or spiritual advisor, and indicated that he would pursue disciplinary sanctions if Hiles disclosed Hastie's identity or any identifying details about her to anyone outside the disciplinary process. Shaw also forbade Hiles from attending any services or programs at the Church of Our Saviour or at St. Paul's during the period of the inhibition.

By letter dated March 28, 1996, Shaw and Harris notified all clergy of the Diocese that Hiles had been relieved of his duties due to charges of sexual misconduct. The letter stated: "The press has been informed and there will be no further comments on the particulars of this situation until it has been resolved."

The standing committee convened on April 11, 1996, to consider the charge and determined that, if the allegations were true, an offense as defined in the canons may have been committed. It referred the matter to the Church attorney for investigation, all pursuant to Title IV, Canon 3, §§ 11 and 12, of the national Church canons. On May 6, 1996, Hastie formally charged Hiles with the offenses of immorality and conduct unbecoming a member of the clergy.[8] She did so as victim of the alleged conduct.[9]

The Hileses filed their complaint on May 13, 1996. They alleged that Hastie's allegations of sexual misconduct were false, and that she conspired with the other defendants to destroy

each Offense but without judgment or comment upon the allegation or guilt, and the Standing Committee shall proceed as if a Charge had been filed."

[8]Title IV, Canon 1, § 1, states in relevant part: "A . . . Priest . . . of this Church shall be liable to Presentment and Trial for the following Offenses, viz: . . . (b) Immorality . . . [and] (j) Conduct Unbecoming a Member of the Clergy."

[9]Title IV, Canon 3, § 3, states in relevant part: "A Charge may be made: . . . (e) in a case where the Offense alleged is a Charge specifying the Offenses of . . . Immorality or Conduct Unbecoming a Member of the Clergy, by any adult who is (i) the alleged Victim . . . ."

Hiles's reputation for the purpose of bringing pressure on the mission to relinquish its bequest under the Mears' estate.

On August 6, 1996, the standing committee issued a present-ment against Hiles alleging four offenses: (1) immorality; (2) conduct unbecoming a member of the clergy; (3) violating Title IV, Canon 3, § 19 (confidentiality of proceedings prior to presentment), by filing a complaint in the Superior Court and making public statements; and (4) violating Title IV, Canon 14, § 2 (prohibiting resort to secular courts for the purpose of delaying and hindering the standing committee's consideration of the charge, the Church attorney's investigation and report, and the standing committee's determination whether a present-ment should issue),[10] by filing a complaint in the Superior Court.

2. *Internal church discipline.* The judge dismissed nine of the sixteen counts of the complaint on First Amendment (free exercise of religion clause) grounds, ruling that the court lacked jurisdiction because deciding those claims "would result in judicial interference with the Diocese's discipline of one of its clergymen." Hiles argues that the court had jurisdiction over the subject matter of those claims because they were secular in nature, and their adjudication would not infringe on the defendants' free exercise of their religion.

"[T]he First Amendment prohibits civil courts from interven-ing in disputes concerning religious doctrine, discipline, faith, or internal organization." *Alberts* v. *Devine,* 395 Mass. 59, 72, cert. denied sub nom. *Carroll* v. *Alberts,* 474 U.S. 1013 (1985), and cases cited. It "permits hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters." *Wheeler* v. *Roman Catholic Archdiocese of Boston,* 378 Mass. 58, 61, cert. denied, 444 U.S. 899 (1979), citing *Serbian E. Orthodox Diocese* v. *Milivojevich,* 426 U.S. 696, 724 (1976). The assessment of an individual's fitness to serve as a priest is a particular ecclesiastical matter entitled to this constitutional protection. See *Alberts* v. *Devine, supra* at

---

[10]Title IV, Canon 1, § 1(e), states that a violation of the canons of the national Church is an offense for which a member of the clergy may be presented and tried.

72-73, citing *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952).

"The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *McClure* v. *Salvation Army*, 460 F.2d 553, 558-559 (5th Cir. 1972). The relationship is considered "intrinsically religious." *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 578 (2002). See *EEOC* v. *Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 800 (4th Cir. 2000) (relationship with minister is "the most spiritually intimate grounds of a religious community's existence"); *Minker* v. *Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354, 1356 (D.C. Cir. 1990) ("determination of 'whose voice speaks for the church' is per se a religious matter"). Once a court is called on to probe into a religious organization's discipline of its clergy, the First Amendment is implicated. See *Natal* v. *Christian & Missionary Alliance*, 878 F.2d 1575, 1577 (1st Cir. 1988); *Dowd* v. *Society of St. Columbans*, 861 F.2d 761, 763 (1st Cir. 1989). When that occurs, principles of church autonomy deprive the court of subject matter jurisdiction. See *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 286 (1997). We turn first to the claims that were dismissed on jurisdictional grounds.

3. *Defamation.* The Appeals Court concluded that Hiles's claim against Hastie for defamation (count 1) was "a secular dispute that may be adjudicated according to the established rules of common law and relevant statutes," without infringing on the right of the Episcopal defendants to the free exercise of their religion. *Hiles* v. *Episcopal Diocese of Mass.*, 51 Mass. App. Ct. 220, 229 (2001). The Appeals Court relied on *Hester* v. *Barnett*, 723 S.W.2d 544 (Mo. Ct. App. 1987). The plaintiffs in that case were a lay couple who confided in the defendant, a Baptist minister, problems they were having with their children. They did not allege that they were members of the church served by the minister. The minister allegedly defamed the couple from the pulpit and in the community at large by declaring them to be thieves, arsonists, and child abusers. The couple brought suit

against him alleging several grounds, including defamation. A judge granted the minister's motion to dismiss the complaint. The Court of Appeals reinstated the defamation claim (and others), holding that if the plaintiffs could show that "although delivered in the milieu of religious practice, the beliefs asserted as religious were not held as such in good faith, but were used to cloak a secular purpose: in this case, to injure reputation," then those beliefs would not be protected by the First Amendment. *Id.* at 559.

*Hester* v. *Barnett, supra*, is distinguishable because there, the alleged defamatory statements, although made in a religious context, were not made in the context of a religious disciplinary proceeding, and the statements were considered conduct, as opposed to beliefs, thus requiring a different analysis.[11] See *id.*; *Sherbert* v. *Verner*, 374 U.S. 398, 403 (1963). In contrast, matters arising out of the church-minister relationship, including church discipline, come within the category of religious belief, and thus are entitled to absolute protection. Our inquiry is whether Hiles's defamation claim arose from the church-minister relationship, and specifically, whether it arose from religious discipline. See, e.g., *Minker* v. *Baltimore Annual Conference of United Methodist Church, supra*; *Natal* v. *Christian & Missionary Alliance, supra* at 1578.

The basis of Hiles's claim was Hastie's letter to Shaw. The letter was published solely in a canonical context. Although the letter functioned as the confession of a parishioner to her bishop about her own wrongdoing, it also had significance as an accusation that Hiles violated his trust as a member of the clergy. In that respect the letter supplied the basis for Shaw's initiation of disciplinary proceedings against Hiles under the canons. The letter also was incorporated into Hastie's formal charge, the method for victims of certain alleged abuse by the clergy to initiate disciplinary proceedings. Thus, Hastie's letter was used to invoke the Church's internal disciplinary procedures in two

---

[11] "The First Amendment religion provisions contain two concepts, 'freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.' " *Madsen* v. *Erwin*, 395 Mass. 715, 727 (1985), quoting *Cantwell* v. *Connecticut*, 310 U.S. 296, 303-304 (1940).

ways, and inextricably became part of the internal disciplinary proceeding. We are bound to step aside and permit the Church to consider the veracity of Hastie's charge through that process. See *Natal v. Christian & Missionary Alliance, supra* at 1578.

In addition, both Hastie, as parishioner, and Hiles, as an ordained priest of the Episcopal Church, accede to the canons of the Episcopal Church and are bound by them. See *Parish of the Advent v. Protestant Episcopal Diocese of Mass., supra* at 288; *Wheeler v. Roman Catholic Archdiocese of Boston, supra* at 64 n.5. The Supreme Court has said that "[t]he right to organize voluntary religious associations . . . for the ecclesiastical government of *all the individual members*, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it." (Emphasis added.) *Kedroff v. St. Nicholas Cathedral, supra* at 114.

Hiles's defamation claim against Hastie touches the core of the church-minister relationship. The Episcopal Church, like others, has a singular interest in protecting its faithful from clergy who will take advantage of them. Indeed, a church entrusts to its ministers the spiritual care and guidance of parishioners at times when those parishioners are particularly vulnerable, and a church has a strong interest in preventing abuse of that trust. For purposes of the First Amendment, a parishioner victim who invokes the Episcopal Church's internal disciplinary process may invoke as her own freedom of belief the church's right to be free from State court interference in that process. The First Amendment's protection of internal religious disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate those proceedings could be tested in a civil court.[12]

Hiles's reliance on *Madsen v. Erwin*, 395 Mass. 715, 726-727

---

[12]Our analysis of this issue is predicated on the fact that the only defamatory publication allegedly made by Hastie was made to the Church itself, within its internal disciplinary procedure. The complaint makes no allegation that Hastie repeated her allegedly defamatory statements to any other persons or in any other forum. The absolute First Amendment protection for statements made by a Church member in an internal church disciplinary proceeding would not apply to statements made or repeated outside that context.

(1985), is misplaced. In that case the Christian Science Monitor terminated the employment of a female reporter, who was also a member of the Christian Science Church, on grounds that she was homosexual, and homosexuality conflicted with the religious standards of the Church. The employee brought a multicount civil action that included a claim for defamation. We held that the defamation claim failed to survive an attack under rule 12 (b) (6), but we permitted the employee to amend her complaint because it was not clear that she could prove no set facts in support of her claim as would entitle her to relief. *Id.* at 726-727. In doing so we acknowledged a distinction between two principles arising out of the First Amendment. The first is the rule "that the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization." *Id.*, quoting *Alberts* v. *Devine*, 395 Mass. 59, 72 (1985). The second is the rule "that the rights of religion are not beyond the reach of the civil law." *Madsen* v. *Irwin, supra.* With respect to the second, we said that "a clergyman may not with impunity defame a person." *Id.* at 727. As with the plaintiff in *Hester* v. *Barnett, supra,* the plaintiff in *Madsen* v. *Erwin, supra,* presented a defamation claim that did not involve the church-minister relationship. As such, her claim was not barred absolutely. By contrast, Hiles's claim arises out of the church-minister relationship in the religious discipline context. His claim comes within the category of the freedom to believe, a matter that the Church is entitled to decide, free from governmental intrusion.

There is no merit to Hiles's contention that, because his claim "arose from actions taken at the time [that the inhibition was issued], rather than the decision to [issue the inhibition]," it did not involve the church-minister relationship. It is immaterial how a cause of action is framed. Hastie's letter is inextricably part of the Church disciplinary process. Moreover, Hiles alleged in his complaint that, as a result of Hastie's letter, he suffered damage that included the loss of esteem of his parish and professional associates, professional disrepute, and the loss of authority to practice his profession. With respect to the loss of authority to practice his profession, he alleged that the scope of the inhibition imposed on him as a result of Hastie's letter exceeded

the limits suggested by the National Commission of Constitution and Canons of the Protestant Episcopal Church for cases of alleged sexual misconduct or immorality. Hiles's suit thus would require the court to interpret canon law, apply church policies, assess his fitness and reputation as a priest, and review decisions of the bishop. These are matters that are undoubtedly ecclesiastical, and therefore must be left to the Church to decide through its own internal disciplinary procedures. See *Natal* v. *Christian & Missionary Alliance, supra* at 1577. See also *Yaggie* v. *Indiana-Kentucky Synod Evangelical Lutheran Church in Am.*, 860 F. Supp. 1194, 1199 (W.D. Ky. 1994), aff'd, 64 F.3d 664 (6th Cir. 1995) (noting "substantial federal authority" for declining jurisdiction over defamation claims against religious organizations). The judge correctly dismissed the defamation count against Hastie on jurisdictional grounds. See *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass.*, 426 Mass. 268, 286 (1997).

4. *Conspiracy.* Hiles alleged (counts 2, 3, 9, 10) that Hastie, Shaw, Harris, and the Diocese conspired "to abuse, discredit, and vilify [him] because of his refusal to submit to unjust Diocesan demands to cooperate in the wrongful appropriation of his parish's funds," and that the conspiracy included publication of Hastie's letter. The judge dismissed the count against Hastie and granted summary judgment for the other defendants on First Amendment (jurisdictional) grounds.

The Appeals Court concluded that the Superior Court judge erred in declining jurisdiction of the conspiracy counts against Hastie, Shaw, and Harris, but that the conspiracy count against the Diocese failed to state a claim. See *Hiles* v. *Episcopal Diocese of Mass.*, 51 Mass. App. Ct. 230, 232 (2001). In reaching its conclusion, the Appeals Court applied the familiar standard of reviewing the allowance of a motion to dismiss, accepting the allegations of the complaint, and all inferences as may be drawn therefrom in the plaintiff's favor as true. See *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 486 (2000). That is not the correct standard for a motion under rule 12 (b) (1).

Because the defendants moved pursuant to Mass. R. Civ. P. 12 (b) (1) to dismiss the complaint for lack of subject matter jurisdiction, and because their motions were supported by af-

fidavits, the burden fell to Hiles to prove jurisdictional facts. See *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 577 n.2 (2002); *Brown* v. *Tobyne*, 9 Mass. App. Ct. 897, 898 (1980). Under this "factual challenge" to jurisdiction, "the plaintiff's jurisdictional averments [in the complaint] are entitled to no presumptive weight [and] the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Valentin* v. *Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).[13] The Hileses availed themselves of the opportunity to file counter affidavits.

We have reviewed the entire record and conclude that Hiles failed to sustain his burden. Contrary to Hiles's assertion, his conspiracy claims are not secular. They require the court to inquire into the motives of these defendants to determine whether the Church's disciplinary procedures were properly invoked, and thus, impermissibly "would require judicial intrusion into, rules, policies, and decisions which are unmistakably of ecclesiastical cognizance." *Natal* v. *Christian & Missionary Alliance*, *supra* at 1577. The First Amendment precludes jurisdiction over the subject matter of these claims. The judge correctly declined jurisdiction.[14]

5. *Civil rights claims.* Hiles alleged (counts 5, 6, 7, and 8) that Shaw and the standing committee violated his rights under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H, 11I. He claimed that Shaw threatened to bring disciplinary charges against him if he exercised his rights to freedom of speech under the United States and Massachusetts Constitutions by discussing with others the ecclesiastical charges brought by Hastie against him. He also claimed that Shaw threatened to

---

[13]By contrast, a motion under Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), that is unsupported by affidavit presents a "facial attack" based solely on the allegations of the complaint, taken as true for purposes of resolving the complaint. See *Holt* v. *United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

[14]The judge ordered the conspiracy count against Hastie dismissed, pursuant to rule 12 (b) (1). She treated the motion to dismiss filed by the other defendants as a motion for summary judgment. Because she ruled in each case, correctly, that the court lacked subject matter jurisdiction, and because the burdens under rule 12 (b) (1) and under summary judgment are different, it is more appropriate that counts 3, 9, and 10 be dismissed. That disposition is more consonant with a lack of subject matter jurisdiction. See *Williams* v. *Episcopal Diocese of Mass.*, 436 Mass. 574, 577 n.2 (2002).

bring disciplinary charges against him if he exercised his right to assemble and worship under the United States and Massachusetts Constitutions by attending services at the Church of Our Saviour or St. Paul's during the period of the inhibition. With respect to the standing committee, he alleged that they violated his civil rights by "upholding, affirming, ratifying, and in effect reissuing [Shaw's] threat."

Here, too, the Superior Court judge granted summary judgment for the defendants on First Amendment (jurisdictional) grounds, stating that the claims "arise out of Hastie's letter and the subsequent disciplinary measures instituted by the Diocese in response to her allegations." The Appeals Court agreed with this aspect of her decision, and noted that the conduct about which Hiles complains comported "with procedures adopted by the Episcopal Church, see Title IV, Canon 1, [§ 2(a), and] we see nothing that would justify the intrusion of the civil courts into the course of events which are the subject of the Temporary Inhibition. . . . [A]ny protest by Hiles with respect to them must be lodged with the ecclesiastical courts, not the civil courts." (Footnote omitted.) *Hiles* v. *Episcopal Diocese of Mass., supra* at 231. We agree. See *Wheeler* v. *Roman Catholic Archdiocese of Boston*, 378 Mass. 58, 64 n.5 (1979).

Moreover, Title IV, Canon 14, § 1, provides in part that "[c]lergy who have voluntarily sought and accepted ordination in the Church have given their express consent and subjected themselves to the discipline of this Church and may not claim in proceedings under this Title constitutional guarantees afforded citizens in other contexts." *Id.* at 231-232. A minister's consent to disciplinary proceedings historically has been a prominent reason for courts to decline to exercise jurisdiction over a dispute on First Amendment grounds. See *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 729 (1871). See also *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 114 (1952). The Superior Court judge correctly declined to accept jurisdiction of the civil rights counts. See *Parish of the Advent* v. *Protestant Episcopal Diocese of Mass., supra* at 286.[15]

We turn now to consider those claims dismissed by the judge

---

[15]The form of the judgment on counts 5, 6, and 7 should be a dismissal rather than summary judgment. See note 14, *supra.*

in the Superior Court for reasons other than the First Amendment.

6. *Negligence.* Hiles alleged (counts 11 and 12) that Shaw and Harris were negligent in their "duty to conduct investigations in a reasonably prudent manner . . . and to provide due process." The Appeals Court concluded that the gist of these counts is a claim that Shaw and Harris "republished" the details of Hastie's defamatory letter in a press release. *Hiles* v. *Episcopal Diocese of Mass., supra* at 233. It did so by "[d]rawing all reasonable inferences favorably to the plaintiff . . . from the complaint." *Id.* As discussed in part 4, *supra*, because Shaw and Harris moved to dismiss these counts under rule 12 (b) (1) with support by affidavit, no presumptive weight is given to the averments of the complaint, and Hiles has the burden to prove all jurisdictional facts. The record does not contain any press release. It does contain copies of several newspaper articles, but these say nothing except that Hiles had been suspended from his priestly duties pending an investigation of allegations of sexual misconduct.[16] We can draw no inference of what was contained in any press release.

Title IV, Canon 3, § 19, states: "Prior to the issuance of a Presentment or a determination not to issue a Presentment, as the case may be, the matter shall be confidential, except as may be determined to be pastorally appropriate by the Ecclesiastical Authority." In this case, the "Ecclesiastical Authority" is Bishop Shaw. As previously noted, Hiles agreed to abide by the Church canons, including the disciplinary procedures, when he was ordained an Episcopal priest. He is bound by the canons.

There has been no showing by Hiles, as was his burden, that Shaw was acting outside the purview of the Church's disciplinary procedures when, assisted by Harris, he issued a press release. There may be any number of reasons why Shaw and Harris might have notified the media by providing to them what appears to have been the least amount of information about Hiles's temporary inhibition. Clergy are often visible members of a

---

[16]The articles make no mention of the Mears' estate. They mention countercharges by the vestry of St. Paul's Church to the effect that the charges against Hiles amounted to retaliation for the vestry's opposition to Shaw's stand on other matters.

community, including the secular community. When they abruptly cease to serve in their spiritual capacity, official notice from superiors in the Church hierarchy to parishioners and the public may be appropriate. Because this was a matter that required the exercise of discretion in the administration of the Church's disciplinary process, the Superior Court judge correctly declined jurisdiction of the negligence claims.[17]

7. *Slander.* The Superior Court judge was correct to grant summary judgment for Shaw on count 13, which alleged that Shaw slandered Hiles by calling him a "bully" and a "liar." Publication of a defamatory matter to a third person is an essential element of defamation. See *Rumney* v. *Worthley,* 186 Mass. 144, 145 (1904). In his affidavit, Hiles failed to identify any third person who was present at the time. Where affidavits were filed with the motion to dismiss, the judge was entitled to treat the matter as appropriate for summary judgment. The judge was not required to give Hiles the opportunity to amend his complaint to identify such a person, as the Appeals Court suggests. Even if there were such a person, Hiles had the opportunity to identify him, or her, in his affidavit.

8. *Assault and battery.* The Superior Court judge denied the motion to dismiss as to count 14, which alleged that Shaw assaulted and beat Hiles by striking him with a pen. Hiles appealed from the judge's order of remand to the District Court. In light of this opinion, we affirm the remand order.

9. *Loss of consortium.* The Superior Court judge's order granting summary judgment to the defendants on all of Lauretta Hiles's claims for loss of consortium (count 15), except as it relates to Hiles's claim for assault and battery, is affirmed for obvious reasons. The order remanding that count to the District Court is affirmed.

10. *Intentional infliction of emotional distress.* The order granting summary judgment to the defendants on this claim by Lauretta Hiles (count 16) is affirmed for the reasons stated by the Appeals Court. *Hiles* v. *Episcopal Diocese of Mass., supra* at 234.

Treating the judgments on counts 3, 5, 6, 7, 9, 10, 11, and 12

[17]The form of the judgment on counts 11 and 12 should be a dismissal rather than summary judgment. See note 14, *supra.*

as dismissals rather than summary judgment, the judgment of the Superior Court is affirmed.

*So ordered.*