Muse, Christopher J., J.
This matter came before the court on Defendants, The Episcopal Diocese of Massachusetts, M. Thomas Shaw, Barbara C. Harris, and Roy F. Cederholm’s (“the diocesan defendants”) motion for summary judgment. The plaintiff, Carolyn Petrell (“Petrell”), claims that the defendant, August A. Rakoczy (“Rakoczy”) took advantage of her, by engaging in an impermissible relationship with her, while Rakoczy was serving as rector of the Christ Church Parish of Plymouth, Inc. (“Christ Church”). Petrell has brought several claims against the diocesan defendants and, as further described, she alleges that she suffered damages including but not limited to, a divorce from her husband, loss of custody of her children, and emotional distress.

BACKGROUND

Rakoczy was a duly ordained priest of the Episcopal faith who at some point came to serve as rector of the defendant, Christ Church. The three bishops, at various times, served as bishops of the Diocese of Massachusetts. The diocese is structured as follows.
Episcopal Diocese of Massachusetts
The Episcopal Diocese of Massachusetts (“Diocese”) is organized subject to M.G.L.c. 180 as a charitable organization. Each diocese is presided over by one Bishop who serves in the capacity as head administrator. Defendant, Thomas Shaw (“Shaw”) has been the Diocesan Bishop since 1995. Second in line is the Bishop Suffragan. The Defendant, Barbara C. Harris, (“Harris”) served as Bishop Suffragan from 1989-2000. After she retired, the Defendant, Roy F. Cederholm (“Cederholm”) has served as Bishop Suffragan from March 2001 to the present. Each diocese is part of a hierarchical church structure under the Protestant Episcopal Church in the United States of America (“PECUSA”). The various dioceses adhere to the doctrines and disciplines established by PECUSA. They are also bound by its national constitutions and canons. However, each diocese also has its own constitution and canons that govern that diocese itself.
Within the diocese are mission churches that the diocese operates. Further down the hierarchical structure, are independent parishes located in different regions of the state wherein each diocese sits. Each parish is a separate corporate entity and is governed by a vestry made up of laypeople from that parish. Thus, each diocese is made up of parishes in its geographical area, and each parish is then considered a separate entity from tire diocese. The Diocese Bishop is mainly responsible for ensuring that each parish conducts its affairs according to the canons and constitution of the national diocese.
Christ Church Parish of Plymouth
Christ Church is organized as a corporate entity in Plymouth, Massachusetts. Bradford Burgess (“Burgess”) serves as the senior Warden of Christ Church. The vestry of Christ Church is responsible for electing representatives who will ultimately manage the parish affairs. The vestry and representatives are not diocesan employees. In relation to the diocese, the parishes owe ecclesiastical and spiritual allegiance to the bishop, diocese, and PECUSA. Therefore, as its own entity, it is up to the vestry to hire a priest to serve as its parish rector, not the diocese. In late 1996, Christ Church began to search for a new parish rector and Rackoczy was one of several candidates.
At the time Christ Church was searching for a new rector, Rackoczy was a priest in Pennsylvania. Through the hiring process, Christ Church had interviewed Rackoczy in person and over the phone. Coming to Christ Church from a parish located in another state, Rackoczy had to transfer his canonical residence from the Pittsburgh Diocese to the Massachusetts Diocese. The canonical procedures for accomplishing this transfer include certain criteria to establish that the priest is in good standing. The diocese has a procedure to evaluate a priest’s stand *397 ing. A new diocese will not accept a priest until it receives of a “letter dimissory” from the transferring diocese. In this case, the Massachusetts Diocese received such a letter from the Pittsburgh Diocese affirming that Rackoczy was a priest in good standing. Further, upon transfer, a background check is then completed. For some time the Oxford Document Management Company was employed by the diocese to send out detailed questionnaires to all prior employers, schools and diocese that have had worked with the priest. This was done during Rakoczy’s transfer to Massachusetts.
The record indicates that there was no evidence showing that any of the questionnaire responses suggested that Rakoczy engaged in any inappropriate sexual conduct in his past. Further, the diocese of Pittsburgh also did not know of any information of that nature concerning Rakoczy. Rakoczy himself offered the only significant information, obtained by the Massachusetts Diocese, when he admitted that he had an altercation with a person who was stalking him. In addition, Bishop Shaw learned from Bishop Rowley of the Northwest Pennsylvania Diocese, that Rakoczy had a breakdown during or in the aftermath of his divorce sometime in the 1990s, but had since recovered. None of the information given about Rakoczy’s background related to sexual misconduct in any way. Further, the diocese requires that priests enter sexual misconduct awareness training or show proof of such training elsewhere before they begin employment. After Christ Church hired Rakoczy, Bishop Harris met with him to speak about the goals and mission of the church, as this is a diocese tradition. Rakoczy began his position as rector of Christ Church in April 1997.
Plaintiffs Relationship with Rakoczy
The eleven-month relationship between the Plaintiff and Rakoczy lasted from May 2000 to April 2001. On May 10, 2000, Plaintiff, Carolyn V. Petrell (“Petrell”), went to Rakoczy to speak with him out of concern for her sister-in-law’s daughter whom she suspected had a drug problem. During this meeting, Rakoczy indicated that he could “easily fall in love” with Petrell. Petrell then started meeting Rakoczy on a regular basis, beginning the next day, to seek guidance regarding her marital problems. On May 21, 2000, Petrell left her marital home after Mr. Petrell had been arrested. On June 4, 2000, Petrell and Rakoczy had their first sexual encounter. A few days later, on June 7, 2000, Rakoczy met with Petrell’s husband and explained to her husband that the marriage was broken and that he should join another church.
Petrell retained legal counsel for divorce on June 9, 2000, and then filed a formal complaint for divorce on June 26, 2000. Petrell and Rakoczy spent time with each other’s children and family members. Petrell’s eight-year-old daughter wrote a seven-page letter to her father on August 13, 2000, revealing Petrell and Rakoczy’s relationship. By January 2001, Petrell’s divorce was final. However, on April 17, 2001, Petrell informed Rakoczy that their relationship was over because she was planning to reconcile with her husband. Petrell later explained that this decision was also made because the relationship with Rakoczy became abnormal as it progressed and she discovered new information about him, causing her to suspect he had homosexual tendencies and an infatuation with pornography.
Christ Church Involvement
Episcopalian Priests are relatively free to have personal relations. However, they may not engage in such relationships with parishioners, as this is in violation of ecclesiastical rules. An anonymous parishioner told Betsy Bishop that she/he suspected Rakoczy was having an inappropriate relationship with another parishioner. Betsy Bishop relayed this information to Shaw. Shaw declined to investigate the matter, as it was based on hearsay.
After Petrell ended the relationship, Rakoczy reacted poorly, and was hospitalized. A Christ Church official informed the diocese of his hospitalization. At this time, the diocese had become aware of the relationship and began its discipline of Rakoczy. Cederholm advised Rakoczy of the process involved in bringing ecclesiastical proceedings against him. Rakoczy chose to renounce his vows instead of contesting the charges. In an effort to inform the parishioners that Rakoczy would no longer be serving as their Rector, Cederholm personally explained to them that the situation involved an inappropriate relationship by Rakoczy without identifying Petrell.
Plaintiffs Allegations
Petrell has brought several claims against the diocese. Petrell alleges that Shaw was negligent in the hiring and retention of Rakoczy and that in doing so, he breached a fiduciary duiy. Further, Petrell asserts that Harris and Cederholm were also involved in negligent hiring, supervision, and retention practices, and breach of a fiduciary duty. Petrell asserts that the Episcopal Diocese is vicariously liable, further alleging that it ratified Rakoczy’s acts, which were outside the scope of his employment in addition to negligent hiring, retention and supervision. Moreover, Petrell asserts that Cederholm placed her in a false light by announcing her relationship to the parish.

STANDARD

In deciding a motion for summary judgment, the facts must be viewed “in the light most favorable to... the nonmoving party, taking all the facts set forth in its supporting affidavits as true.” G.S. Enterprises, Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991) (citing Grahm v. Quincy Food Serv. Employees Ass’n Hosp., Library & Pub. Employees Union, 407 Mass. 601, 603 (1990)). “The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (quoted with approval in G.S. *398 Enterprises Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991)). The moving party bears the burden of demonstrating the absence of a triable issue, and that the summaiy judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). “[S]ummaiy judgment motion is made in reliance solely on pleadings, depositions, answers to interrogatories, and admissions on file.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 713-14 (1991). Hence, the moving party may satisfy its burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). While this court is reluctant to grant summary judgment in negligence matters, it may do so where no rational view of the evidence permits a finding of negligence. Mullens v. Pine Manor College, 389 Mass. 47, 56 (1988).

DISCUSSION

I. Whether The Diocesan Defendants Owed a Legal Duty to Ms. PetreU.

A. Plaintiffs Breach of Fiduciary Duty Claims

The courts of the Commonwealth have a long history of recognizing the creation of a fiduciaiy duty when one places his/her utmost trust and confidence in another’s advice or judgment. See Van Brode Group, Inc., v. Bowditch & Dewy, 36 Mass.App.Ct. 509, 516 (1994). Thus, the unique duty bestowed upon an individual once a fiduciaiy relationship is entered into, arises when that individual is aware that the other person is relying on his/her services and “.. . reposes faith, confidence, and trust ... in his/her judgment or advice.” Id. No appellate court in the commonwealth has recognized a general fiduciaiy duty arising out of the relationship between a church organization and its parishioners. See Dushkin v. Desai, 18 F.Sup.2d 117 (1998). However, a justice of the Superior Court recently addressed a similar issue in his Decision and Order on Defendant’s Motion for Summaiy Judgment in the case of Beal v. Broadard et al., No. SUCV2002-05765 (2005 Mass.Super.) (19 Mass. L. Rptr. 114), where the court (Smith, J.) found that, while no case law establishes a fiduciaiy duty arising out of the church organization-parishioner context, it is not explicitly excluded. In Beal, the court denied summaiy judgment for Broadard, a ministerial servant of the Jehovah’s Witness faith and second cousin of the plaintiff, on the issue of fiduciaiy duty, because a fiduciaiy duty may be found to exist between the plaintiff and defendant, where the defendant molested the plaintiff during Bible study sessions in her home. The Beal court reasoned that it may be shown that the defendant owed the plaintiff a fiduciaiy duty where “William Broadard’s relationship with the Beals went far beyond an ordinary clergy-parisoner relationship because Broadard was related to the Beals, knew them personally and had reason to know that the Beals would place trust in him.” Id. at 10. Thus, in certain circumstances within the realm of the unique relationship of parishioner to priest, the courts may find a fiduciaiy duty. However, as between a church organization and parishioner, the relation is not so intimate so as to support such a duty running between them. See id. at 11 (summaiy judgment allowed as to larger organization overseeing the Jehovah’s Witness faith).
In the present case, the unique organizational structure between the Episcopal Diocese and the various parishes does not provide for the creation of a fiduciaiy relationship between the diocese and its parishioner members. Specifically, one did not exist between Petrell and the diocesan defendants. As the case law indicates, a fiduciaiy duty arises out of a unique or intimate one-to-one relationship, where the person owing the duty has reason to know that another is relying on his guidance and/or advice. See Van Brode Group, Inc. v. Bowditch & Dewy, 36 Mass.App.Ct. 509, 516 (1994). Based on the organization of the Episcopal Diocese of Massachusetts as it relates to each parish, where the diocese does not actually hire each parish rector and each parish is deemed a separate corporate entity from the diocese, the diocesan defendants cannot be found to have owed Petrell a fiduciary duty. They did not have any personal contact with the parishioners of each parish so as to create an awareness that individual parishioners relied upon them for guidance or advice.
This does not mean that a fiduciaiy relationship could not exist between Petrell and Rakoczy, where she personally sought him out for counseling, trusted him, and he was well aware of it.

Plaintiffs Vicarious Liability Claims Based on Negligence

The sine qua non of a negligence claim is proof that the defendant owed a duty to the plaintiff. See Royal Indem Co. v. Pittsfield Electric Co., 293 Mass. 4, 6 (1935). With this basic element of negligence in mind, the Supreme Judicial Court defined negligence as “the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which, in the discharge of the duty then resting on him, the person of ordinary caution and prudence ought to exercise under the particular circumstances.” Beaver v. Costin, 352 Mass. 624, 626 (1967). Once it has been established that the defendant owed the plaintiff a duty of care, it must then be shown that the defendant’s act or failure to act constituted a breach of that duty, resulting in damages or injury to the plaintiff. Baggs v. Hirschfield, 293 Mass. 1 (1935). Thus, in order to maintain that a defendant is negligent for failure to take some action, the plaintiff must initially show that the defendant in fact had a duty bestowed upon him to take the action in question under the circumstances. Id
In the context of the employer-employee relationship, the determination of whether the employer owes a duty *399 to third parties injured by the actions of an employee, is centered upon the question of the employer’s control over the employee. See Silvis v. Woodhouse, 356 Mass. 119,124 (1969). The establishment of the employer-employee relationship then gives rise to vicarious liability on the part of the employer wherein the employer may be held liable for the employee’s torts that are committed within the scope of his/her employment. See Worcester Insurance Co. v. Fells Acre Day School, 408 Mass. 393, 404 (1990). Thus, beyond the establishment of control, it must also be demonstrated that the employee acted within the scope of employment when committing the alleged act. Id. Employee conduct is considered to be within the scope of employment when the nature of the employee’s behavior is of the type he/she was hired to do and it takes place during the hours of employment in a manner motivated to serve the employer. Worcester, 402 Mass, at 404.
In the present case, aside from establishing and implementing the rules governing the process of changing a rector’s canonical residence, the diocesan defendants had no direct involvement in the hiring of Rakoczy. Therefore, it cannot be said that the diocesan defendants owed Petrell a duty, or could be found vicariously liable for Rakoczy’s actions.

Plaintiff's Claims of Negligent Hiring, Supervision and Retention

In order for a plaintiff to establish that a church organization was negligent in its hiring, supervision and/or retention of a priest, the plaintiff must present evidence of the church organization’s prior knowledge of the alleged characteristics or actions on the part of the priest which deemed him/her unfit for such a position and therefore should have precluded his/her appointment or retention as a priest. See Carini v. Roman Catholic Bishop of Springfield, 219 Mass. 117, 118-19 (1914). For example, in Gagne v. O’Donaghne, 1996 WL 1185145, (5 Mass. L. Rptr. 501) the Superior Court denied summary judgment for the defendant Bishop, because there was evidence that he knew of the priest’s prior allegations of child molestation when he retained the priest, and did not investigate into the alarming issues concerning the priest’s past during the hiring process. Id. Similarly, in Mendez v. Geoghan, 1999 WL 792202, (10 Mass. L. Rptr. 417) the Superior Court recognized that “While it is safe to say that there is no such thing as clerical malpractice in Massachusetts ... it does not necessarily follow that, for example, a cleric would be wholly immune from liability if he or she stood idly by while a parishioner unknowingly walked into a place or position that the cleric knew would expose that parishioner to great danger.” Thus, the central issue in a court’s determination that negligence exists on the part of a church organization in the hiring or retention of a priest, is whether those responsible for hiring the priest possessed knowledge of the alleged harmful prior actions or characteristics of the priest that would make him/her unfit for the position. Id.
Petrell’s claims of negligent hiring, supervision and retention on the part of the diocesan defendants must fail because plaintiff has not presented sufficient evidence that the diocese knew or should have known that Rakoczy was the kind of person who would be sexually exploitative under these circumstances. The Massachusetts Diocese received a letter from the Pittsburgh Diocese affirming that Rackoczy was a priest in good standing. A background check was performed by the Oxford Document Management Company in the form of a detailed questionnaire sent to all prior employers, schools and diocese that had worked with Rakoczy. The record indicates that there was no evidence that any of the questionnaire responses suggested that Rakoczy engaged in any inappropriate sexual conduct in his past. Further, the diocese of Pittsburgh also did not know of any information of that nature in relation to Rakoczy. As described above, the Massachusetts Diocese learned that Rakoczy admitted he had an altercation with a person who was stalking him, and that Rakoczy had a breakdown in relation to his divorce sometime in the 1990s, from which he recovered. The court again emphasizes that none of the information given about Rakoczy’s background related to sexual misconduct in any way. Therefore, this court cannot impose a duty upon the diocese, and its Bishops, because Rakoczy’s actions were not foreseeable

II. Plaintiffs Claims Related to First Amendment Issues

One fundamental tenet is that a civil court is restricted from interpreting or ruling on religious decisions. See Alberts v. Devine, 395 Mass. 59, 72 (1985). The provisions of both the state and federal constitutions explicitly “prohibit civil courts from intervening in disputes concerning religious doctrine, discipline, faith or internal organization.” Id. Consequently, when the issue of one’s fitness to serve a church organization as minister is brought before the courts, the First Amendment is implicated and the courts must then make a careful determination of whether the issues brought before it are ecclesiastical or secular in nature. A court must approach such issues cautiously because the “assessment of an individual’s qualifications to be a minister, and the appointment and retention of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other state interference.” Id. at 72-73.
However, the case law indicates that the actions or decisions of a church organization are not completely beyond the scrutiny of the courts, especially when third parties are affected. See Mendez. In this sense, courts must confront such issues delicately so as to identify when improper clergy conduct upon a third parly does in fact fall within the realm of sanctions found in civil law, even if religious doctrine justifies the conduct. See Employment Division of Human Resources Oregon v. Smith, 494 U.S. 872 (1990). The Alberts court illustrated this notion when it explained, *400 “although freedom to believe is absolute, the freedom to act cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of the protection.” 395 Mass, at 73.
It is therefore understood by the courts of this Commonwealth that the First Amendment allows “. .. hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters.” See Hiles v. Episcopal Diocese of Massachusetts, 437 Mass. 505 (2002), citing Wheeler v. Roman Catholic Archdiocese of Boston, 378 Mass. 58, 61, cert. denied, 444 U.S. 899 (1979); Serbian E. Orthodox Diocese v. Milivojevich, 426 U.S. 696, 724 (1976). The Hiles court explained that this relationship between church and minister is “intrinsically religious,” and that when a court is called upon to question a church organization’s discipline of its clergy arising out of his ecclesiastical duties, “. . . principles of church autonomy deprive the court of subject matter jurisdiction.” Id. at 511.
Petrell’s claims seeking to enforce church rules are not within this court’s subject matter jurisdiction, as these issues are protected by the first amendment. It is not within this court’s power to decide what procedures the church should use to check the background of its candidates, to determine their ecclesiastical fitness. This was the only role assumed by the diocesan defendants.
The objective duty of the diocese was to assess whether or not Rakoczy was in good standing in order to change his canonical residence. The diocese administered a comprehensive inquiry in order to make this assessment. It is evident that the standards and ethics upheld by the diocese run a course parallel to the secular world with regard to personal relations and the canons of people in power. Thus, like society where moral and legal imperatives set forth that one cannot engage in certain conduct (i.e. the deplorable behavior of Rakoczy), the canons have similar rules. But, notwithstanding the similarities, the canons refer to the internal teachings of the church and are therefore not secular. The diocese undertook the review of his fitness through the procedures relating to obtaining a letter dimissory. These defined the scope of its inquiry, and any control the diocese had over Rakoczy’s transfer was religious in nature. The internal policies of the church are not for the court to interfere with or judge.

III. Plaintiff’s False Light Claim

Massachusetts courts do not recognize the tort of false lightin this Commonwealth. See Elm Medical Laboratory, Inc. v. RKO General, Inc., 403 Mass. 779, 787 (1989). Therefore, summary judgment is granted with regard to Petrell’s cause of action alleging false light.

IV. Plaintiff’s Emotional Distress Claims

Pursuant to G.L.c. 207, §47B, a plaintiff may not maintain an action alleging alienation of affection, even when the claim is alleged under the guise of a claim for intentional infliction of emotional distress.[1] See Quinn v. Walsh 49 Mass.App.Ct. 696, 703 (2000). Thus, where the triggering factor alleged to have caused the intentional infliction of emotional distress upon the plaintiff is an adulterous affair, the courts do not consider such claims as separate or different from one based solely on alienation of affection. Id. at 704. Therefore, such claims cannot be brought as they have no support grounded in law where “(b]y abolishing these common law torts, the Legislature has registered its intent to preclude recovery for emotional distress resulting from adultery.” See Id. at 705; Korper v. Weinstein, 57 Mass.App.Ct. 433, 439 (2003) (holding claim for intentional infliction of emotional distress not shown where consensual sexual relations involved).
Although this court is sensitive and respectful of the emotional harm that the plaintiff experienced as a result of her relationship with Rakoczy, her allegations of intentional infliction of emotional distress as against the diocesan defendants is not supported by law or the facts. The plaintiffs claims of emotional harm from the breakup of her marriage and the loss of her children’s affection resulting from her consensual sexual relationship cannot support an action for intentional infliction of emotional distress. See G.L.c. 207, §47B; Korper v. Weinstein, 57 Mass.App.Ct. 433, 439 (2003); Quinn v. Walsh 49 Mass.App.Ct. 696, 703 (2000). Furthermore, even if the defendant’s actions caused the plaintiffs distress, it cannot be said that a consensual sexual relationship rises to the level of extreme and outrageous conduct that a reasonable person could not endure. See Quinn, 49 Mass.App.Ct. at 706.

ORDER

For the foregoing reasons, the Diocesan Defendants’ Motion for Summaiy Judgment is ALLOWED as to the Plaintiffs fourth, fifth and sixth causes of action against M. Thomas Shaw, Plaintiffs seventh cause of action against Barbra C. Harris, Plaintiffs eighth, ninth, and tenth causes of action against Roy F. Cederholm, Plaintiffs eleventh and twelfth causes of action against the Diocese of Massachusetts, and Plaintiffs intentional infliction of emotional distress claims as they relate to the diocesan defendants.

To prevail on a claim based on this tort, a plaintiff must establish (1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, (2) that the defendant’s conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community, (3) that the actions of the defendant were the cause of the plaintiffs distress, and (4) that the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.” See Quinn v. Walsh 49 Mass.App.Ct. 696, 706 (2000), quoting Tetrault v. Mahoney, Hawkers & Goldings, 425 Mass. 456, 466 (1997).